[No. A126181. First Dist., Div. Two. May 4, 2011.]

In re the Marriage of JILL L. and KENNETH L. DAVENPORT.
JILL L. DAVENPORT, Appellant, v.
KENNETH L. DAVENPORT, Respondent.

1508

COUNSEL

O'Brien Watters & Davis, Michael G. Watters, Deirdre Taber Kingsbury, Diane A. Singleton and Joseph A. Piasta II for Appellant.

Perry, Johnson, Anderson, Miller & Moskowitz, John E. Johnson and Deborah S. Bull for Respondent.

OPINION

**RICHMAN, J.**—Appellant Jill L. Davenport and respondent Ken L. Davenport were married in 1948, a marriage that would produce three daughters and a vast estate. Jill[1] and Ken separated in 1990, and in 2006 Jill filed a petition for dissolution. The petition was filed by a long-established Sonoma County law firm, signed by an experienced lawyer there. Early on, a young and inexperienced attorney at that firm became Jill's primary attorney, and interacted with Ken's attorneys for the next two years, interactions that would generate a 35-page register of actions and 19 volumes of court files.

In May 2008 Jill filed a motion under Family Code section 271[2] seeking $600,861 in attorney fees and $332,933 in costs. Ken responded with a section 271 request of his own, and the cross-motions were heard over a five-day period by the Honorable Cerena Wong, an experienced family law judge who had been handling the matter for well over a year. Following extensive post hearing submissions, Judge Wong issued a 31-page decision that denied Jill's request and granted Ken's, awarding him $100,000 in sanctions and $304,387 in attorney fees.

Jill appeals, asserting procedural and substantive arguments, the former essentially contending that Judge Wong ignored the law, including the law of evidence, and the latter essentially contending there is no substantial evidence supporting the award. We conclude that none of Jill's arguments has merit, and we affirm.

---

[1] The parties indicated at the hearing below that they preferred to be called by their first names. Thus, and to avoid confusion, we continue that practice. No disrespect is intended.

[2] Unless otherwise noted, all further statutory references are to the Family Code.

## BACKGROUND

### The Community and the Dissolution

As noted, Jill and Ken were married in 1948. As Jill's attorney would describe it, she "supported Ken during the marriage by raising their three daughters and managing the household. Jill supported Ken in the business ventures. Among other notable achievements, Ken became the youngest Ford dealer in the nation at age 23."

Sometime around late 1969 or early 1970 Ken began to develop an industrial park in Santa Rosa known as Industry West, which came to include some 500,000 square feet of factory and warehouse space. In addition to Industry West, Jill and Ken acquired numerous other properties, including a large ranch in Montana, land in Idaho, and various properties in and around Santa Rosa. While the final accounting has not yet been completed, according to correspondence from the parties the value of the community estate is in the range of $57 million.

Jill and Ken separated in 1990, and remained in that state until March 2006, when a petition for dissolution was filed. During the separation, Ken apparently continued to manage the couple's financial affairs. While the relationship between Jill and Ken during this period is not germane to the issue before us, we do note there was evidence of agreement and cooperation, including their participation in joint estate planning favorable to Jill, and agreement to sell off many of the Industry West properties.

There is, by contrast, also evidence of incompatibility, at least toward the end of the separation period, as illustrated by a letter from Jill dated February 3, 2006, which begins as follows:

"Dear Ken:

"I received your letter of 1/10/06.

"I am disappointed that you are not able to grasp what the problem is here, and disappointed too that you will not allow me to talk to you about it.

"I must tell you that I was really frightened by your manic raging at me at your house. It felt just like the old days. I felt so threatened. I will never allow you to do that to me again.

"As for your letter, you really missed the mark. To mention just one thing in your letter: Why would I stand around and wait for your house to sell?

Why should that be my problem? This is my concern at this time: As I have told you, you have stepped over the line. You have lied to me, you have not been honest with me, and you have lost my respect. You made these choices. I am concerned that you are being taken advantage of in your current situation. You are vulnerable. I have noticed a dramatic change in your behavior and your spending habits over the last two or three months which concerns me for your welfare as well as our assets."

Jill's letter goes on to make certain requests, including for increased monthly payments from Ken and copies of financial records. And the letter ends with this:

"Once I have had the opportunity to review our financial records (which I have never done for the duration of our marriage) in addition to the $20,000 per month, I would like to agree to a specified lump sum of money to provide me with a liquid sum to give me protection in the event that I need more than my monthly income, for whatever purpose. By lump sum, I mean a substantial sum to be determined after my review of our financial records. I do not want to worry about my ability to enjoy the fruits of our labor over all of these years, nor do I want to worry in case of catastrophic events over which neither of us have control.

"This is something we can do very simply and with no legal fees or time involved. If we have to hire attorneys, we will spend what would probably amount to a lot of legal fees and charges. I look forward to hearing from you as soon as possible.

"Please respond on or before February 10, 2006.

"(s/ Jill)"

"[V]ery simply and with no legal fees," Jill implored. It was not to be.

Ken responded on February 7, 2006, indicating he would do his best to comply, but that he would "need to discuss the large cash payment you would like. This will require some time." The next thing in the record is Jill's petition for dissolution of marriage, filed days later, on March 1, 2006. Jill was 75 years old at the time, Ken 78.

### The Attorneys

The petition for dissolution was filed by the firm of O'Brien Watters & Davis, LLP, with Michael G. Watters, CSB (California State Bar) No. 63140, listed as the individual attorney. From all indications, Michael Watters played

a rather limited role thereafter, as very early on—and at least by May 16, 2006—Andrew G. Watters, CSB No. 237990, entered the picture as counsel. Andrew Watters had become a member of the State Bar only months earlier, in November 2005, and began working at the firm on February 24, 2006. He met Jill three days later, and from that point on, he said, he met with her on more than 100 occasions over the next two years. And as he described it under oath, he "personally handled or [was] personally involved in each and every transaction between the parties since the petition was filed, as well as each and every discovery request, discovery event, court proceeding, and other substantive matter." In short, Andrew Watters became the lead lawyer for Jill in what would necessarily be a complex family law litigation. And as will be seen, his conduct in the representation of Jill would become a significant issue at the hearing.[3]

Ken was represented over time by three attorneys. The first was Michael Merrill, CSB No. 40963, of Merrill, Arnone & Jones, LLP. In January 2007, James Benoit, CSB No. 41741—described by Andrew Watters at one point as the "dean of the local Family Law Bar"—substituted in. Mr. Benoit represented Ken until March 2008, when he was replaced by John E. Johnson, CSB No. 114902, of Perry, Johnson, Anderson, Miller & Moskowitz LLP. Mr. Johnson was Ken's attorney in the proceeding below, and his firm represents Ken on appeal.

### The Judge

The first few matters in the dissolution proceeding were held before the Honorable Gary Nadler, and his involvement is not pertinent here save in one respect: his ruling and admonition in an early (July 20, 2006) motion filed by Jill seeking to compel further responses to form interrogatories. Granting the motion but denying sanctions, Judge Nadler noted as follows:

"1. Counsel for Petitioner/Wife made an unreasonable attempt to meet and confer before filing Petitioner/Wife's Motion to Compel further responses to her Form Interrogatories (Family Law Set One) on 7/20/06. Specifically, counsel wrote a single meet and confer letter dated 5/18/06 and failed to respond to Respondent/Husband's reply letter dated 5/25/06. In fact, counsel for Petitioner/Wife failed to discuss the matter further with counsel for Respondent/Husband in any manner at any time thereafter. [¶] . . . [¶]

---

[3] The firm of O'Brien Watters & Davis, LLP, represents Jill on appeal. Andrew Watters is not on the briefs and, according to the State Bar Web site, is no longer practicing at the firm. (<http://members.calbar.ca.gov/search/member_detail.aspx?x=237990> [as of May 4, 2011].)

"5. Sanctions were requested by both parties. Based on the mutuality of conduct of the parties, each party's request for sanctions is DENIED. See *Townsend v. Superior Court* (1998) 61 Cal.App.4th 1431 [72 Cal.Rptr.2d 333].

"6. Counsel for both parties are admonished to change their meet and confer practices so that meeting and conferring is meaningful and not just a token gesture."

Sadly, it would turn out, Judge Nadler's admonition was not heeded.

By early 2007 the Honorable Cerena Wong had become involved, and handled all matters thereafter, including the hearing that led to the order from which Jill appeals. Judge Wong is an experienced jurist, having been appointed to the court in 1985. More significantly, she presided over a family law department for eight years,[4] an experience that, as will be seen, was manifest throughout the lengthy proceeding below.

### The Proceedings in the Dissolution

The numerous proceedings in the dissolution proceeding are not individually germane to the issue before us, and we do not set them out in detail. A few general observations are appropriate, however, beginning with the fact that the proceeding generated 19 volumes of court files which, Judge Wong noted, is "outrageous" for a family law case. The register of actions is 35 pages long and refers to numerous matters that can fairly be said to be unrelated to the substance of the dissolution proceeding, including, for example, no fewer than eight motions related to discovery filed by Jill, many of which were never resolved on the merits. Such matters also include no fewer than three orders to show cause regarding contempt directed to Ken (and, in one case, his and Jill's daughter), one of which is pertinent here, especially as Judge Wong would comment on the incident underlying it—and unfavorably to Ken. The incident was discussed in Jill's August 4, 2006 order to show cause and affidavit for contempt, the essence of which was that a "4-way" meet and confer had been arranged and ordered by the court, and Ken "refused to meet and confer if attorney Andrew G. Watters was present in the room."

Also of significance is that on March 2, 2007, the parties stipulated that Judge Wong would act as case manager pursuant to section 2450, which

---

[4] Judge Wong also served on the planning committee for the 1998 Family Law and Procedure Institute, and on the faculties for the 1999 Family Law and Procedure Institute and on CJSP Family Law Basics. She also taught and lectured on various family law issues, and participated in the Sonoma County Bar Association, Family Law Legal Update, 1997–2000.

provides in pertinent part as follows: "The purpose of family centered case resolution is to benefit the parties by providing judicial assistance and management to the parties in actions for dissolution of marriage for the purpose of expediting the processing of the case, reducing the expense of litigation, and focusing on early resolution by settlement." (§ 2450, subd. (a).) It developed that the case manager function was frequently ignored, defeating the salutary purpose it is designed to serve.

## The Section 271 Motion

On May 23, 2008, Jill filed and served two motions.[5] The first was for an accounting, asserting that the parties' experts were not in agreement.[6] The second was the motion leading to the appeal here, seeking sanctions and attorney fees in the amount of $933,794. Both motions were filed without any attempt to meet and confer, and without any involvement of Judge Wong in her capacity as case manager. Both motions were noticed to be heard on June 17, 2008, before Judge Wong who, at a specially set hearing on June 3, vacated the June 17 hearing date in favor of a series of dates in July, dates that were subsequently vacated at a June 20 hearing.

Before describing Jill's motion in detail, we digress briefly to discuss the timing of a section 271 motion, as that would become an issue below. The leading family law treatise describes the law this way: "**Noticed motion; during or at end of litigation?** . . . [T]here is no statutory requirement that the motion be made, or the sanctions be assessed, at any particular stage of the litigation . . . . [¶] Some courts have stated that §271 sanctions ordinarily should not be awarded until the end of the litigation where the sanctionable conduct occurred. [See *Marriage of Freeman* (2005) 132 CA4th 1, 6 [33 Cal.Rptr.3d 237]—§271 'contemplates that sanctions be assessed at the end of the lawsuit, when the extent and severity of the party's bad conduct can be judged' (internal quotes omitted); *Niko v. Foreman* (2006) 144 CA4th 344, 369, 50 CR3d 398, 416 (citing text)] [¶] But other authority rejects that standard: The trial court *need not* wait until the end of the lawsuit to assess

---

[5] Both motions had been filed much earlier in an abbreviated form, on April 9, 2008, filings that were essentially blank papers, designed to reserve the dates on the court calendar. Andrew Watters did not consult with Mr. Johnson on the date, nor even advise him of the filings, causing him to complain about the timing of the motions, including that they were filed late in the afternoon of May 23, 2008, the Friday before the Memorial Day weekend, and at the last possible moment.

[6] In May 2007, the parties had stipulated that Ken would provide certain accountings to Jill, and that if the parties' experts could not agree "on the nature and extent of the accounting to be provided, [Jill's] motion for an accounting [would] be put back on calendar for hearing upon reasonable notice." The motion for an accounting is not pertinent to the issues on appeal, expect perhaps as evidence of Jill's tactics, and nothing more will be said of the substance of this motion.

§271 attorney fee sanctions. '[S]ection 271 is meant to advance the policy of the law to promote settlement and to encourage cooperation . . . [.] As a matter of logic, to promote cooperation a trial court must be able to apply sanctions *during the course of the litigation* when the uncooperative conduct arises in order to encourage better behavior as the litigation progresses.' [Citations.]" (Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 2010) ¶ 14:265a, p. 14-71 (rev. # 1, 2010), citation omitted (Hogoboom & King).)

Jill's motion was on a family law standard form pleading, and styled "Sanctions under Family Code sec 2107." The supporting affidavits checked on that form were completed income and expense declaration; points and authorities; and, under "Other," Declaration of Andrew G. Watters, and Declaration of Albert E. Hickey, MAI. In paragraph 5 of the form, "Attorney Fees and Costs," the motion sought fees of $600,861 and costs of $332,933. And in paragraph 9, "Other Relief," it sought "an order under Family Code sec. 271 awarding attorney fees payable by husband to wife. For an order awarding sanctions payable by Husband to Wife under Family Code sec. 2107(c) and the [In re Marriage of] Feldman case."

The accompanying papers included a 52-page declaration from Andrew Watters which, according to Jill's opening brief, attached 1,250 pages of exhibits. Much of the declaration was inappropriate, asserting hearsay, argument, opinion, and conclusion, and was improper on several bases. An early passage in the declaration illustrates some of this, where Andrew Watters purports to describe Jill's description of Ken's "negotiating tactics, habits, and personality traits," which he labeled "Deal in the pocket," "Poor mouth," and "Artificial crisis," and each of which he claimed to illustrate. With that by way of introduction, Andrew Watters went on to "testify" as follows:

"6. At the time Jill was working on her Declaration, I had not seen these tactics used or been on the receiving end of any of them. I was skeptical at that early stage in this case that someone could really use these tactics effectively outside of a car dealership. (Ken was reportedly the youngest Ford dealer in the county at age 23, with the opening of Davenport Motor Sales, Big Timber, Montana.) However, throughout our dealings with Ken in this matter, I have personally observed Ken use each of the aforementioned tactics. I've seen first hand that Ken can be a very persuasive person, and that Ken seems to use all of his abilities and skill to get the best deals possible for himself. Unfortunately, we've learned that Ken has also used this great skill and ability to take advantage of his wife.

"7. During the pendency of this proceeding, despite all the warning, OSC; re contempt, court orders, motions, depositions, emails, and tens of thousands

of dollars in letters back and forth between the attorneys, the 'inconvenient truth' here is that Ken has used his unusually strong business skill and acumen against his spouse despite his fiduciary duties and Family Code sections 1100–1101 and 271. The purpose of this declaration is to provide the Court with sufficient factual support to grant Jill's Motion for attorney fees as sanctions under Family Code section 271."[7]

The declaration did go on to assert as facts several claimed derelictions or misrepresentations by Ken, including that he (1) omitted entirely two major assets on his April 4, 2006 schedule of assets and debts (3635 and 3645 Standish Avenue, total estimated value $3.1 million); (2) produced "a chart of net worth signed 4/9/06 and dated retrospectively to November 30, 2005" that shows "total assets of $30.5 million" or "*less than half* of the net worth stated" in a December 2005 financial statement given to a loan officer; (3) submitted an April 4, 2006 schedule of assets and debts which did not state the values for almost all items; and (4) engaged in various discovery abuses in 2006 and 2007, such as delaying his deposition for 10 months.

The accompanying papers also included a 13-page memorandum of points and authorities, citing only one case: *In re Marriage of Feldman* (2007) 153 Cal.App.4th 1470 [64 Cal.Rptr.3d 29] (*Feldman*). And as to it, the memorandum said this: "Here, the *Davenport* matter might as well be called *In re Marriage of Feldman—The Sequel*. If ever a dissolution of marriage action in Sonoma County warranted the imposition of sanctions on a party, this is the case." Or, as Andrew Watters would later describe it, "[T]he course of conduct described in *Feldman* is virtually identical to the course of conduct involved in this case"—indeed, "this case is *worse* than what happened in *Feldman*."

As *Feldman* would become Jill's shorthand description of all that was claimed to be wrong with Ken's conduct, we digress from the chronology to discuss the facts of that case, which involved a 34-year marriage during which the husband created a large number of privately held companies (called by the court the Sunroad entities), devoted to investing in, and developing, real estate and in owning auto dealerships. According to the husband, his assets were worth over $50 million, and the characterization of the Sunroad entities as separate or community property was a significant issue in the dissolution proceeding. (*Feldman, supra,* 153 Cal.App.4th at p. 1474.)

---

[7] This declaration notwithstanding, Jill asserts here that "case law recognizes that even in Family Law Court, argument is not proper in declarations. *In re Marriage of Heggie* (2002) 99 Cal.App.4th 28, 30, fn. 3 [120 Cal.Rptr.2d 707]. In *Heggie,* the court stated that the common practice of family law practitioners including arguments in their declarations 'is a sloppy practice which should stop.' "

The wife served the husband with interrogatories and a request for production of documents, and took depositions of the husband and various employees of the Sunroad entities. Dissatisfied with what the husband ultimately produced, the wife filed an application for an order imposing monetary sanctions against the husband for a violation of his fiduciary duty and, as relevant here, requiring the husband to pay her attorney fees based in part on section 271, subdivision (a). Following full briefing and a hearing, the trial court ruled that the husband breached his fiduciary duty to disclose financial information to the wife, and ordered the husband to pay sanctions in the amount of $250,000 and attorney fees of $140,000. The Court of Appeal affirmed. (*Feldman, supra*, 153 Cal.App.4th at pp. 1474–1475.)

As part of its ruling, the trial court found that the husband intentionally had sought to circumvent the disclosure process and that his conduct had frustrated the policy of promoting settlement, including that the husband failed to disclose untold millions of dollars in assets, which the Court of Appeal repeatedly referred to as showing a "pattern of nondisclosure." (*Feldman, supra*, 153 Cal.App.4th at pp. 1485, 1486, 1488 & fn. 14.) These undisclosed assets included a $1 million Israel bond the husband had purchased from the Israeli government; a $5,797,500 home that became his personal residence (*id.* at pp. 1483–1484); a 401(k) account (*id.* at p. 1487); "several" new Sunroad entities (*id.* at pp. 1488–1489), including one formed to own land for an auto dealership in Mexico City obtained with a $2.52 million loan (*id.* at p. 1489); and "several," perhaps as many as "nine," new entities, some associated with automobile dealerships in Mexico, some which owned real property in Chula Vista, and one which owned land in San Diego (*id.* at p. 1490). Those were the nondisclosures in *Feldman*.

*Feldman, Feldman, Feldman,* Jill repeated below, both as to the substance of her motion and its timing, illustrated by the court session at which Judge Wong set Jill's motion for hearing. There, Andrew Watters represented that "the *Feldman* case is nearly on point" and "provides guidance. We want [the motion] heard before trial." This prompted the following colloquy:

"THE COURT: Okay. So in the motion that you filed . . . , you are saying that the facts in this *Davenport* case are very similar, if not identical, to the facts of the *Feldman* case, which, of course, is an extremely egregious set of facts involving one party who is in charge of almost everything and stonewalled all efforts to cooperate, so therefore the court was duty-bound to give a hearing prior to [trial]. So you're saying that if this court gives you this hearing, the court is going to be brought up to speed to a set of facts that are as shocking and as egregious as the *Feldman* case. Is that what you're telling me?

"MR. WATTERS: Yes, Your Honor.

"THE COURT: I understand that, but you have the burden to show that there has been a deliberate part on Mr. Davenport—that he has hidden, done all the terrible things that Mr. Feldman did. I'm very familiar with the *Feldman* case. We're all very familiar with the *Feldman* case. And what you're telling me is that Mr. Davenport has engaged in that kind of egregious conduct?

"MR. WATTERS: Some of the conduct in *Feldman* is nearly identical. If the court reviews my declaration, the court will see evidence, in Mr. Davenport's own handwriting, that contradicts the Schedule of Assets and Debts. I suggest that is exactly what *Feldman* was designed to rectify."[8]

As will be seen, Judge Wong would determine that Jill's proof fell short of her counsel's exuberant advocacy.

On June 19, 2008, Ken filed his opposition to Jill's motions. The opposition included Ken's declaration; those of his attorneys, Merrill, Benoit, and Johnson; and that of an expert witness, Attorney Thomas Wolfrum. The opposition also included a document entitled "Evidence of Opposing Counsel's Lack of Cooperation and Lack of Conduct Promoting Settlement."

On October 6, 2008, Ken filed a "Notice of Intention to Request Attorney Fees and Costs Pursuant to Family Code Section 271," accompanied by the "First Supplemental Declaration of John E. Johnson."

On October 16, 2008, Jill filed opposition to Ken's request under section 271. The opposition consisted of a memorandum of points and authorities and Andrew Watters's declaration. The memorandum argued first, in a short, 20-line argument, that Ken's "271 'request' is technically defective." The second argument was that Ken's requested fees "have little or no connection to alleged 'sanctionable' conduct of Jill."

On October 27, 2008, Jill filed eight separate statements of evidentiary objections, objecting to the declarations (or supplemental declarations) filed on behalf of Ken, including those of his expert witness Wolfram, and his attorneys, Johnson, Benoit, and Merrill. Jill also filed a separate statement of objections to Ken's "Evidence of Lack of Cooperation" by Jill. All told, Jill's objections were over 40 pages.

---

[8] Jill remains relentless here, her briefs saying things such as this: the "case was/is a classic *Feldman* case." Or this: "Ken behaved as badly as the husband in *Feldman, supra,* 153 Cal.App.4th at 1483, trying to 'circumvent the process, *hide the ball*,' and play '*Go fish—you figure it out!*' Ken Davenport's conduct is a classic case for sanctions pursuant to Family Code §271."

## The Hearing on the Section 271 Motions

Judge Wong had ruled that each side could have a day and a half for its presentation, a total of eight hours. The hearing began on October 29, 2008, with differences between counsel as to just how the matter was to proceed, with Mr. Johnson urging that Judge Wong hear live testimony. Judge Wong, who had spent two days reviewing the papers in preparation for the hearing, disagreed, and ruled that the motions were "dependent on declarations and exhibits." Those exhibits, those documents, Judge Wong said, were "putting on your evidence." Thus ensued a lengthy hearing, extending over a period of five days, ending on November 18, 2008.

Both sides had filed extensive declarations, which had numerous exhibits attached by way of electronic storage disks. And counsels' presentations essentially consisted of, as Andrew Watters would describe it, "highlighting the key parts . . . in the evidence," the attorneys pointing to various exhibits they claimed supported their positions, much of which involved correspondence and interactions between counsel. Both sides objected from time to time, almost always to no avail, as Judge Wong made it abundantly clear that she could separate the wheat from the chaff. This early colloquy illustrates the point:

"MR. WATTERS: Actually, there was one more thing. There are evidentiary objections, a number of them, that wife has filed to respondent's declarations filed in opposition in support of his own 271 request. So I was wondering if now would be the appropriate time to review the evidentiary objections, or obtain a ruling, or is there some later time that Your Honor would prefer?

"THE COURT: We'll deal with your objections to the presentation of Mr. Johnson after you're done.

"MR. WATTERS: Okay.

"MR. JOHNSON: Your Honor, I agree with that. We had objections to counsel's declaration as well, but I'm willing to reserve that until the end and let the court make a decision on all of it. . . . Notwithstanding the fact there might be improper argument, aspersions, declarations, the court can sift through that and get to the meat of it without us wasting two or three hours going over every line item that may be objectionable.

"THE COURT: That was my general feeling. I have never been given such a microscope of the workings of lawyers as I have with this. This is my eighth year in Family Law, and I have never been showered with the amount

of e-mails and attorney communication, back and forth, to this degree. And as far as I'm concerned, fighting over comments or statements made as to whether or not they're relevant or whether or not they're objectionable, you know, this is not a jury for heaven's sake. I'm a judge. You know, I can sift through this stuff. I might have some comment about what I think to be more lawyerly conduct and lawyerly language . . . . You should be able to rely on the court being able to read what it reads and eliminate what's not relevant.

"MR. WATTERS: I understand, Your Honor. I just wanted to make sure that those would be considered—our objections. I'm sure that Your Honor will consider them, so I'm sorry for mentioning that.

"THE COURT: Okay."

And so it proceeded over the five days, with some of the last day devoted to the attorneys' argument, their summations of their positions.

Though no statement of decision is required on a section 271 motion (*Feldman, supra*, 153 Cal.App.4th at pp. 1496–1497), both sides indicated they wanted one, and Judge Wong agreed to issue one. Both sides filed proposed tentative decisions, and on February 24, 2009, Judge Wong filed her "Statement of Decision re Respondent's Motion for Attorney Fees, Costs, and Sanctions (Tentative)." On March 11, 2009, Jill filed a "Specification of Controverted Issues and Proposals for Statement of Decision" and "General Objections re Tentative Decision."

## Judge Wong's Decision

On May 19, 2009, Judge Wong filed her final statement of decision. It was a comprehensive 31 pages, and in it Judge Wong made 15 specific findings, all of which were followed by detailed facts supporting those findings. Because Jill contends that Judge Wong's order is not supported by substantial evidence, we will discuss the evidence in more detail in connection with that issue. Suffice it to say here that among other things Judge Wong found that Jill's counsel's "failure to meet and confer is sanctionable conduct"; that the facts in Jill's moving papers "do not rise to the level [of *Feldman*] such that [Jill's] motion on attorney fees and sanctions needed to be heard before trial"; that "no valid evidence or support for an expedited hearing was presented"; that Jill's "entire accounting motion was unnecessary and founded on inaccurate representations by [Jill's] counsel"; that "[Jill's] counsel's hostile and disrespectful correspondence is sanctionable"; that "[Jill's] counsel made many references to what was presented and said in mediation in violation of Evidence Code § 1119"; that "[Jill's] counsel's conduct regarding surreptitious conduct with both computer consultants in relation to extracting computer data that what was believed to include highly sensitive and privileged

material was inappropriate and sanctionable"; and that "all fees relating to Wife's Sanction and Accounting Motions could have been avoided by Wife's counsel."[9]

Judge Wong's statement of decision ends with this:

"GOOD CAUSE SHOWN: the Court finds and orders:

"1. Petitioner's request that the Court find that Respondent Ken Davenport and his attorneys engaged in a course of conduct that was sanctionable in violation of Family Code 271, 2107 and the case of Feldman (2007) 153 Cal.App.4th 1470 is DENIED. There has been a failure of proof sufficient to penalize husband and his attorneys Merrill, Arnone, Benoit or Johnson.

"2. Respondent's request that the Court find that Petitioner through her attorney(s) from the firm of O'Brian, Watters & Davis engaged in a course of conduct that was sanctionable in violation of Family Code 271 is GRANTED. The evidence presented was clear and convincing that uncivil, rude, aggressive, and unprofessional conduct has marred this case from the very beginning from counsel Watters. The Court questions the wisdom of such a large firm as O'Brien, Watters to choose to 'educate' a newly admitted lawyer with a case that involved millions of dollars of varied assets in California and other states, with a long term marriage and complicated trust holdings. With no background in either civil or family law litigation, Mr. Andrew Watters admitted to the Court that he was *taught* to litigate this case with unbridled aggression. These uncooperative and uncivil courses of action have caused Mrs. Davenport unnecessary delays and unnecessary attorney fees and costs. *Both* Mr. and Mrs. Davenport deserve justice and fairness in the Court. The Court will note that Mr. Davenport's conduct in the beginning of the case to refuse to discuss the case if Mr. Andrew Watters was in the room was inexcusably rude and uncalled for. Respondent's arrogance must have hit a sensitive nerve in counsel because Petitioner's case became a case that rapidly deteriorated into unprofessionally rude conduct and speech after that.

"3. The Requests of Wife for payment of $933.000 [*sic*] in attorneys fees in the form of sanctions is unreasonable and not supported by the evidence.

"4. The Court finds that this hearing prior to any trial based on Mr. Watters' representations was unnecessary and unfortunately unreasonably expensive to the parties and to the Court's limited resources.

---

[9] The facts listed in support of the last finding state that "Had Wife's counsel done any number of the following, it is likely the costly motions and hearings relating thereto could have been avoided: [¶] (i) Met and conferred with counsel; [¶] (ii) Been more respectful and cooperative; [¶] (iii) Used the Case Manager; [¶] (iv) Accepted Husband's counsel's offers to use Mr. Hoslett, or agree to a neutral forensic accountant."

"5. The Court orders that in the form of Family Code 271 sanctions, $100,000 are payable from Petitioner to Respondent. Petitioner is to pay to Respondent attorney's fees to defend this motion, $304,387.00."

Following various motions by Jill, Judge Wong entered findings and order after hearing on May 29, 2009, from which Jill filed a timely notice of appeal.

## DISCUSSION

Jill's opening brief begins with a dramatic "preamble," which reads as follows:

### "I. PREAMBLE

"This appeal is brought to overturn a miscarriage of justice because the trial court refused to follow the law in this Family Law case. In the words of the trial court: [¶] '*I am probably committing reversible error or something, but I feel that mostly you are arguing about letters, emails, all manner of documents that competent counsel use in discussion and settlement efforts, things of that sort, and they might not necessarily stand up in a very strict evidence code scrutiny, but this is an OSC, and this is family law, and the judge should have as much evidence as possible to get as much information, so I am usually very, very liberal on OSC, and I don't know why I wouldn't be liberal on this OSC . . . . I just let it all in. It goes contrary to my previous training as a zealous DA hanging onto the evidence code, but I threw it out the window when I started doing family law.*' [Citation.] [¶] Unfortunately, the trial court committed reversible error, denying Appellant a fair hearing."[10]

The drama is misplaced. This isolated comment from a 564-page reporter's transcript hardly described what occurred here.

---

[10] Missing from Jill's quotation is the material in the ellipses italicized below, which, if inserted, would reveal an illuminating concession by Andrew Watters. The full quotation reads as follows:

"THE COURT: . . . I am probably committing reversible error or something, but I feel that mostly you are arguing about letters, emails, all manner of documents that competent counsel use in discussion and settlement efforts, things of that sort, and they might not necessarily stand up in a very strict evidence code scrutiny, but this is an OSC, and this is family law, and the judge should have as much evidence as possible to get as much information, so I am usually very, very liberal on OSC, and I don't know why I wouldn't be liberal on this OSC."

"*MR. WATTERS: I understand.*

"*THE COURT: You haven't appeared on the OSC calendar, as Mr. Johnson, but I deal with exhibits that are written on towels. I get things on Kleenex. I mean, I deal with so many self-represented people, they have no idea what evidence is.* I just let it all in. It goes contrary to my previous training as a zealous DA hanging onto the evidence code, but I threw it out the window when I started doing family law." (Italics added.)

## Section 271 and the Standard of Review

Section 271 provides in pertinent part as follows: "(a) Notwithstanding any other provision of this code, the court may base an award of attorney's fees and costs on the extent to which the conduct of each party or attorney furthers or frustrates the policy of the law to promote settlement of litigation and, where possible, to reduce the cost of litigation by encouraging cooperation between the parties and attorneys. An award of attorney's fees and costs pursuant to this section is in the nature of a sanction. . . ."

██ It has been said that section 271 and its predecessor imposes a "minimum level of professionalism and cooperation," to effect the policy favoring settlement of family law litigation—and a reduction of the attendant costs. (*In re Marriage of Daniels* (1993) 19 Cal.App.4th 1102, 1107 [23 Cal.Rptr.2d 865]; accord, *In re Marriage of Freeman, supra*, 132 Cal.App.4th at p. 6 ["The statute is aimed at conduct that furthers or frustrates settlement of family law litigation and at reduction of litigation cost."]; see also *In re Marriage of Quinlan* (1989) 209 Cal.App.3d 1417, 1422 [257 Cal.Rptr. 850].) Section 271 " 'authorizes sanctions to advance the policy of promoting settlement of litigation and encouraging cooperation of the litigants' and 'does not require any actual injury.' [Citation.] Litigants who flout that policy by engaging in conduct that increases litigation costs are subject to imposition of attorney fees and costs as a section 271 sanction." (*In re Marriage of Corona* (2009) 172 Cal.App.4th 1205, 1225 [92 Cal.Rptr.3d 17].) Some courts have said the section authorizes attorney fees and costs as a penalty for obstreperous conduct. (See *Robert J. v. Catherine D.* (2009) 171 Cal.App.4th 1500, 1520 [91 Cal.Rptr.3d 6]; *In re Marriage of Freeman, supra*, 132 Cal.App.4th at p. 6.)

Sanctions under section 271 are committed to the discretion of the trial court, and will be reversed on appeal only on a showing of abuse of that discretion, that is "only if, considering all of the evidence viewed more favorably in its support and indulging all reasonable inferences in its favor, no judge could reasonably make the order." (*In re Marriage of Corona, supra*, 172 Cal.App.4th at pp. 1225–1226; see *Feldman, supra*, 153 Cal.App.4th at p. 1478.)[11]

---

[11] In a rather convoluted argument, Jill's opening brief urges that the standard of review is de novo, claiming that the appeal presents a question of law. In her description, the question of law is "whether the criteria for an award of attorney fees . . . have been satisfied amounts to statutory construction and a question of law." Jill's reply brief acknowledges that the standard of review is abuse of discretion, an acknowledgement confirmed at oral argument.

## Summary of Jill's Arguments

Jill's arguments on appeal are both procedural and factual. The procedural argument contends that Judge Wong "refused to follow the law, including the rules of evidence and the Code of Civil Procedure," which argument contains four subparts: (1) Judge Wong "Committed Reversible Error By Failing to Abide by the Rule of Law"; (2) Ken's "Declarations and Exhibits Lacked Foundation and Were Replete with Inadmissible Hearsay and Improper Opinions"; (3) Judge Wong "Was Overwhelmed by the Volume of Documents Provided and Did Not Conduct a Full and Fair Hearing"; and (4) "Ken's 'Request' for Family Code §271 Sanctions and Attorney's Fees is Fatally Flawed and Violates Jill's Due Process Rights."

Jill's first factual argument is that Judge Wong abused her discretion "in finding that the conduct of Jill's counsel warranted sanctions," followed by an essentially ancillary argument that "there is no evidence that Jill or her attorneys frustrated settlement or unreasonably increased the costs of litigation."

## Jill's Procedural Arguments Have No Merit

Jill's procedural argument asserts in its first three subparts that Judge Wong failed to abide by the rule of law, an argument fundamentally premised on the preamble quotation set forth above. After repeating that quotation, Jill continues as follows: "So declared the trial court at the hearing on the 271 Motion. [Citation.] Our system of justice is premised on the 'Rule of Law.' America has depended for centuries on an independent judiciary to safeguard its rights. America's very existence can be attributed to a thirst for justice and truth based on the Rule of Law. It is every trial court's sacred obligation and sworn duty to follow the Rule of Law. If the trial court won't follow the law, then who will? [¶] However, the trial court ignored the law and relied on inadmissible evidence, while at the same time ignoring admissible evidence." (Fn. omitted.)[12]

Jill's reply brief goes so far as to assert that "While it is understandable that a Family Law Court, faced with too heavy a calendar, would be tempted to short-cut the process when faced with a time-consuming contest between a wealthy couple, a court is never permitted to toss out the Evidence Code in the interest of saving time or effort. The court must carry out its sworn duties even when it is difficult to do so." With sweeping assertions such as that

---

[12] The footnote asked: "Imagine if a high school civics class had been on a field trip to the court that day. How would the teacher be able to explain to his/her students that the judge said she would not follow the rules?"

Judge Wong ignored the Evidence Code and abused her discretion by overruling objections en masse, Jill essentially asserts that Judge Wong failed to exclude—and, inferentially at least, thereby relied on—improper material. Jill falls far short of showing that Judge Wong failed to carry out her duties—or erred in any way.

■ It is probably enough to cite the various—and numerous—presumptions that support Judge Wong here, specifically: "As an aspect of the presumption that judicial duty is properly performed [(Evid. Code, § 664)], we presume . . . that the court knows and applies the correct statutory and case law [citation] and is able to distinguish admissible from inadmissible evidence, relevant from irrelevant facts, and to recognize those facts which properly may be considered in the judicial decisionmaking process." (*People v. Coddington* (2000) 23 Cal.4th 529, 644 [97 Cal.Rptr.2d 528, 2 P.3d 1081].) Stated another way, a trial court is presumed to ignore material it knows is incompetent, irrelevant, or inadmissible. (E.g., *Harris v. Rivera* (1981) 454 U.S. 339, 346 [70 L.Ed.2d 530, 102 S.Ct. 460]; *Gonzales v. Nork* (1978) 20 Cal.3d 500, 510 [143 Cal.Rptr. 240, 573 P.2d 458]; *People v. Charles* (1967) 66 Cal.2d 330, 338, fn. 12 [57 Cal.Rptr. 745, 425 P.2d 545]; *So. Cal. Jockey Club v. Cal. etc. Racing Bd.* (1950) 36 Cal.2d 167, 176 [223 P.2d 1].) So, if the court states it will ignore evidence, it will be presumed that it did so. (*People v. Powell* (1949) 34 Cal.2d 196, 204–205 [208 P.2d 974]; *Jones v. Morse* (1868) 36 Cal. 205, 207; *Cano v. Tyrrell* (1967) 256 Cal.App.2d 824, 834 [64 Cal.Rptr. 522].)

These presumptions are based on the difference between lay jurors and judges: " 'The juror does not possess that trained and disciplined mind which enables him . . . to discriminate between that which he is permitted to consider and that which he is not. Because of this lack of training, he is unable to draw conclusions entirely uninfluenced by the irrelevant prejudicial matters within his knowledge.' " (*People v. Albertson* (1944) 23 Cal.2d 550, 577 [145 P.2d 7]; accord, *People v. Williams* (1970) 11 Cal.App.3d 970, 977–978 [90 Cal.Rptr. 292]; *People v. Adamson* (1964) 225 Cal.App.2d 74, 77 [36 Cal.Rptr. 894]; *People v. Channell* (1955) 136 Cal.App.2d 99, 111 [288 P.2d 326].) Only proof that the evidence actually figured in the court's decision will overcome these presumptions. (*White v. White* (1890) 82 Cal. 427, 452 [23 P. 276]; *Claremont Press Pub. Co. v. Barksdale* (1960) 187 Cal.App.2d 813, 818 [10 Cal.Rptr. 214]; *Joint Highway Dist. No. 9 v. Railroad Co.* (1933) 128 Cal.App. 743, 765 [18 P.2d 413]; *Stewart v. Douglass* (1909) 9 Cal.App. 712, 715 [100 P. 711].) Clearly, the mere fact that the court heard or read the evidence is not sufficient to overcome the presumptions. (See, e.g., *People v. Tang* (1997) 54 Cal.App.4th 669, 677–678, 683 [62 Cal.Rptr.2d 876]; *People v. Bustamente* (1992) 7 Cal.App.4th 722, 726–727 [9 Cal.Rptr.2d 244]; *Paulin v. Paulin* (1940) 39 Cal.App.2d 180, 184 [102 P.2d 809].)

These presumptions, we conclude, are dispositive. But even if they were not, Jill's arguments fail on the merits—for several reasons.

To begin with, Jill has not identified any claimed inadmissible evidence Judge Wong relied on in support of her statement of decision.

To the extent that Jill's brief alludes to objections made below that were "en masse" overruled, it is true that Judge Wong at one early point indicated that she would overrule both side's objections, leading to what Jill describes as the "futility of making further objections." Despite that, however, both sides continued to make objections, which Judge Wong ruled on as they arose.

■ Jill apparently objects to reliance on correspondence sent by Andrew Watters, an objection that could not be availing. To the extent that Jill asserts lack of authentication, there are many ways correspondence can be authenticated, including by its content (Evid. Code, § 1421) and by the fact that it was a reply (Evid. Code, § 1420; see generally 2 Witkin, Cal. Evidence (4th ed. 2000) Documentary Evidence, §§ 17, 18, pp. 146–147). To the extent that Jill asserts hearsay, such objection is frivolous. As we recently said in *Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 256 [100 Cal.Rptr.3d 296], "one does not need to be Wigmore to know that [Ken] was not introducing [Andrew Watters's comments about opposing counsel] for their truth."

■ In the course of the argument as to Andrew Watters's correspondence, Jill argues that the communications "are protected by the litigation privilege" contained in Civil Code section 47, subdivision (b).[13] However, section 47 operates as a defense to tort liability. (See *Doctors' Co. Ins. Services v. Superior Court* (1990) 225 Cal.App.3d 1284, 1289 [275 Cal.Rptr. 674]; accord, Hogoboom & King, *supra*, ¶ 1:454, p. 1-123 (rev. # 1, 2010) [Civ. Code, § 47, subd. (b) "operates purely as a bar to *tort liability*."].) Jill has cited nothing to the contrary, which is perhaps not surprising, as acceptance of her argument would undoubtedly negate all sorts of sanctions (e.g., discovery sanctions) based on counsel's correspondence.

Beyond that, Judge Wong based her order on much more than Andrew Watters's "communications." She found, for example, a failure to meet and confer; lack of settlement offers; and a failure to demonstrate the reason for the lengthy—and expensive—expedited hearing Andrew Watters claimed was

---

[13] Civil Code section 47 reads as follows: "A privileged publication or broadcast is one made: [¶] . . . [¶] (b) In any (1) legislative proceeding, (2) judicial proceeding, (3) in any other official proceeding authorized by law, or (4) in the initiation or course of any other proceeding authorized by law and reviewable pursuant to Chapter 2 (commencing with Section 1084) of Title 1 of Part 3 of the Code of Civil Procedure . . . ."

necessitated by, in his words, *"Feldman—The Sequel."* Judge Wong also relied on the unnecessary filing of the accounting motion, and the substantial fees necessitated by it and the sanctions motion that could have been avoided. Such conduct is not within the litigation privilege. (See *Stacy & Witbeck, Inc. v. City and County of San Francisco* (1996) 47 Cal.App.4th 1, 8 [54 Cal.Rptr.2d 530].)

Finally, even if Jill had shown that some evidence was improperly admitted—which she has not—she has not shown how the result would have been different. In Evidence Code terms, Jill has not shown that the "errors complained of resulted in a miscarriage of justice." (Evid. Code, § 353, subd. (b).)

The third subpart of Jill's first procedural argument, set forth in two short pages, is that Judge Wong was "overwhelmed by the volume of documents provided and did not conduct a full and fair hearing." Seizing on two isolated comments in the lengthy transcript,[14] Jill asserts that Judge Wong "was responsible for opening the floodgates to the tidal wave of documents with which she was overwhelmed, because she refused to follow the rules of Evidence. The hearing became a 'free-for-all' where arguments were allowed to morph into 'evidence.' The rules, designed to insure a fair trial, were swept away by the deluge of documents." Such hyperbole is followed by nothing supporting it, save more argument about claimed error in dealing with objections, which argument is addressed above. In any event, the argument is fatuous: Jill's brief demonstrates nothing supporting any claim that Judge Wong was "overwhelmed," and to say that she did not conduct a full hearing is incredible.

Jill's other procedural argument is that Ken's request for sanctions was improper because it was not on the Judicial Council form, failed to give notice of what Ken was seeking, and did not set forth the precise amount he was seeking. This argument, too, lacks merit.

Preliminarily, we note that Jill's argument as to the Judicial Council form was not made below, and thus is waived or forfeited. (*Amato v. Mercury Casualty Co.* (1993) 18 Cal.App.4th 1784, 1794 [23 Cal.Rptr.2d 73] ["It must appear from the record that the issue argued on appeal was raised in the trial court. If not, the issue is waived."]; *City of San Diego v. D.R. Horton San Diego Holding Co., Inc.* (2005) 126 Cal.App.4th 668, 685 [24 Cal.Rptr.3d

---

[14] The first of Judge Wong's comments is: "I really do not want to open the door to additional information. The court's already been flooded with an obscene—that's all I can say—an obscene amount of data and information." The second is, responding to Andrew Watters's claim that she was admitting late-filed evidence, "There's too much. You're tapping away at a computer. There's 19 volumes. It's too much. So I'm going to overrule you."

338] [contentions or theories raised for the first time on appeal are not entitled to consideration].) In any event, the argument fails on the merits, as Jill has pointed to no case holding that a section 271 request must be on a Judicial Council form.[15]

 As to the claim of inadequate notice, section 271 does not specify the form of notice to be provided. As *Feldman* expressly states, "the only procedural requirement" is " 'notice to the party against whom the sanction is proposed to be imposed and opportunity for that party to be heard.' " (*Feldman, supra,* 153 Cal.App.4th at p. 1495; see § 271, subd. (b).) Ken's notice more than measured up.

As noted above, on October 6, 2008, Ken served on Jill a notice entitled "Respondent's Notice of Intention to Request Attorney Fees and Costs Pursuant to Family Code Section 271; And First Supplemental Declaration of John E. Johnson." It is obvious from the title of the notice that Ken was requesting attorney fees under section 271. This is sufficient. (*Levy v. Blum* (2001) 92 Cal.App.4th 625, 638 [112 Cal.Rptr.2d 144] [notice must specify the code section or court rule relied on].)

The notice must also advise of the specific grounds and conduct for which the fees or sanctions are sought, and must be directed to the specific person against whom they are sought. (*In re Marriage of Quinlan, supra,* 209 Cal.App.3d at pp. 1421–1422.) Again, Ken's notice here was sufficient, as it and the first supplemental declaration set forth in abundant detail the grounds on which the request was based.

Finally, although the amount of attorney fees ultimately awarded was greater than the amount in the billings attached to Mr. Johnson's first supplemental declaration, the amount awarded is supported in the record. Specifically, Ken's request was "based on the conduct of Petitioner/Wife as documented in the Declaration of John E. Johnson in Opposition to [Jill's] Motion for Sanctions, previously provided to the court and [Jill] on June 19, 2008; and in the First Supplemental Declaration of John E. Johnson filed herewith, together with the complete files and records in this action, and on such evidence *as may be presented at the hearing of this motion.*" (Italics added.) That hearing occurred, of course, and the last page of the transcript reveals how that hearing ended, which was as follows:

---

[15] Some cases suggest that under appropriate circumstances, no written notice is required at all, that oral notice can be sufficient. (See *In re Marriage of Quinlan, supra,* 209 Cal.App.3d at p. 1423; see generally Hogoboom & King, *supra,* ¶¶ 14:115 et seq., pp. 14-36.1 to 14-37 (rev. # 1, 2010), 14:230 et seq., p. 14-60 (rev. # 1, 2010).)

"MR. JOHNSON: Your Honor, we have our billing statements from our last hearing up until present. Should we file those or just include those with the CD that's submitted?

"THE COURT: Well, it's up to you.

"MR. WATTERS: Object to those because we haven't seen them.

"MR. JOHNSON: We have a copy for everybody. They're up to present, essentially.

"THE COURT: Okay.

"MR. WATTERS: In that case, can they provide the missing billing statements from January 31 to June 2008?

"THE COURT: Yes, counsel. All right."

It is not clear from the above whether the updated attorney fee statements were presented that day or not. But there is no doubt they were presented, as on January 9, 2009, Mr. Johnson filed an "Updated Attorney Fee Declaration." It was "an update regarding fees incurred that [Ken] is requesting . . . since [Mr. Johnson's] last declaration of fees filed October 6, 2008 and last summary of fees on November 14, 2008." The declaration attached many pages of billing statements, and then summed up: "Attached as Exhibit 'B' is a duplicate of the billings submitted at the sanctions hearing on November 18, 2008, copies of which were provided to the Court and [Jill's] counsel, Andrew Watters. The total fees incurred relating to [Ken's] sanction request as of November 14, 2008 were $261,392. Therefore, the grand total of fees [Ken] has incurred to date regarding this motion is equal to $304,387. In addition, [Ken] is asking this court to order an additional $250,000 in sanctions to deter future misconduct and impropriety by counsel." The fees awarded Ken are fully supported in the record.

### Substantial Evidence Supports Judge Wong's Award of Sanctions Against Jill

Jill's factual argument, contained in an argument heading that Judge Wong abused her discretion, is that there was no substantial evidence of any sanctionable conduct by Andrew Watters. Or, as Jill's reply brief puts it, there was no evidence that Andrew Watters frustrated settlement or increased costs of litigation, and no nexus between his conduct and any delay. In claimed support of this argument, Jill proceeds to recite the evidence in a fashion

favorable to her, as though Judge Wong's comprehensive, fact-based statement of decision did not exist. Such conduct is not to be condoned.

California Rules of Court, rule 8.204(a)(2)(C) provides that an appellant's opening brief shall "[p]rovide a summary of the significant facts . . . ." And the leading California appellate practice guide instructs about this: "Before addressing the legal issues, your brief should accurately and fairly state the critical facts (including the evidence), free of bias; and likewise as to the applicable law. [¶] Misstatements, misrepresentations and/or material omissions of the relevant facts or law can instantly 'undo' an otherwise effective brief, waiving issues and arguments; it will certainly cast doubt on your credibility, may draw sanctions [citation], and may well cause you to lose the case!" (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2010) ¶ 9:27, p. 9-8 (rev. # 1, 2010), italics omitted.) Jill's brief does ignores such instruction.

Jill's brief also ignores the precept that all evidence must be viewed most favorably to Ken and in support of the order. (*Nestle v. City of Santa Monica* (1972) 6 Cal.3d 920, 925–926 [101 Cal.Rptr. 568, 496 P.2d 480]; *Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362].) This precept is equally applicable here, where Judge Wong issued a statement of decision: "Where statement of decision sets forth the factual and legal basis for the decision, any conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision." (*In re Marriage of Hoffmeister* (1987) 191 Cal.App.3d 351, 358 [236 Cal.Rptr. 543].)

What Jill attempts here is merely to reargue the "facts" as she would have them, an argumentative presentation that not only violates the rules noted above, but also disregards the admonition that she is not to "merely reassert [her] position at . . . trial." (*Conderback, Inc. v. Standard Oil Co.* (1966) 239 Cal.App.2d 664, 687 [48 Cal.Rptr. 901]; accord, *Albaugh v. Mt. Shasta Power Corp.* (1937) 9 Cal.2d 751, 773 [73 P.2d 217].) In sum, Jill's brief manifests a treatment of the record that disregards the most fundamental rules of appellate review. (See 9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, §§ 365, 368, pp. 421–424, 425–426.) As Justice Mosk well put it, such "factual presentation is but an attempt to reargue on appeal those factual issues decided adversely to it at the trial level, contrary to established precepts of appellate review. As such, it is doomed to fail." (*Hasson v. Ford Motor Co.* (1982) 32 Cal.3d 388, 398–399 [185 Cal.Rptr. 654, 650 P.2d 1171].)

As mentioned above, Judge Wong wrote a 31-page statement of decision that recited 15 findings setting forth various categories of things that supported section 271 fees and sanctions here, things that frustrated that

statute's policy of promoting settlement of litigation and reducing its cost. Essentially eschewing all reference to those findings, Jill asserts that there is no substantial evidence supporting the sanction award. Jill is wrong.

Evidence of conduct that increased the cost of litigation included how Andrew Watters dealt with the issue of experts' appraisals, where he contended that Jill would not have obtained independent appraisals of community real properties if Ken had only cooperated and given them his opinion of the property values. Based on this contention, Jill sought to compel Ken to pay for all of the costs of the appraisals she obtained. Ken was forced to hire an expert family law attorney, Thomas Wolfrum, to establish that as a matter of good practice Jill should get her own appraisals, a position with which Judge Wong agreed. In short, Ken was forced to incur substantial attorney fees to establish the simple proposition that Jill would need to obtain independent appraisals of the properties.

There was also evidence that Andrew Watters violated the mediation privilege in Evidence Code section 1119, which evidence included that his May 23, 2008 declaration attached mediation-related documents, set forth what was done and purportedly said in mediation, and referred to agreements reached in mediation. Ken, of course, incurred expenses in addressing these improper revelations.

There was also evidence of Andrew Watters's conduct in connection with the sensitive issue regarding the Industry West computer. Specifically, in late 2007, both counsel had agreed to use Jill's counsel's local computer expert (Kevin Frick) to extract certain information from the Industry West computer, and agreed to protocols relating to that effort. However, in May 2008—and unbeknownst to Mr. Johnson—Jill's counsel fired Mr. Frick and hired one Tessa Swift.

Mr. Johnson learned of this at a June 4, 2008 meeting and, understandingly concerned, wrote to senior partner Michael Watters, expressing his concerns about the computer extraction process, as follows: "Would you please include me on any e-mails that you send to this individual because I do not want any mistakes to be made on that. There is ultra sensitive material, as you're aware, on those disks, and they are of a confidential nature. Highly privileged. You know, it's extraordinary for that broad of an opportunity to be had for disks to be copied in whole. . . . [L]et's be really careful what this individual transmits, and that he or she is acutely and completely aware of the sensitivity involved and the data that he or she is dealing with. Okay? This is really critical."

Michael Watters apparently understood, as he responded: "And just so you know, I've talked to Andrew about how he should have told you guys about the problem with Frick, and we have a sensitive issue because Frick is our IT guy."

Apparently that same evening, Mr. Johnson wrote, asking for the name of the IT person, his or her contact information, and all communications counsel had with that individual. A few days later he reiterated his request for the identity of the new computer person, and again expressed his concern regarding the sensitivity of the computer data. Andrew Watters responded, but not by providing the name of the IT person. Rather, he said to Mr. Johnson, "I would go on about professional courtesy, but as you said at the 4-way on 6/4/08, you don't even know the meaning of the term."

On June 18 Mr. Johnson again wrote to Andrew Watters, that "Your letter does not identify who your new IT person is, nor does it provide me all communications you have had with him or her. Your continued failure to provide me with the name of the computer person you communicated with causes me concern. Would you please provide me his or her name and all correspondence you have had with that person." Still, no response.

Meanwhile, it developed that over the next 48 hours Andrew Watters had at least four e-mails with Ms. Swift, who advised him that the disks would be delivered June 20, 2008. On June 20, a courier service picked up the duplicate computer hard drives from Ms. Swift and delivered them to Mr. Johnson's law firm without any cover letter and without any descriptive information of what was in the package.

In short, during the time Mr. Johnson was asking for the name of, and communications with, the new IT person—all the while emphasizing his concern about the sensitivity of the data involved—Andrew Watters was having numerous communications with that individual. Indeed, it was not until after Andrew Watters had obtained a copy of the hard drive, apparently obtained through a breach of the agreed-upon protocol, that he provided Mr. Johnson with the contact information for Ms. Swift—who, it developed, Andrew Watters had met in a karaoke bar.[16]

---

[16] Criticized for his use of Ms. Swift, which Ken's counsel called a "massive breach of propriety," Andrews Watters's response in his declaration was as follows: "It is true that I found Ms. Swift in a karaoke bar. I am a former web application developer and I have been using computers almost every day since kindergarten (over 20 years). For a number of years in my life, I was considered a 'nerd' (perhaps I still am). In my opinion, a karaoke bar is one of the more likely places to find an IT contractor. Kevin Frick wasn't working out, so I hired Ms. Swift to take his place. They are both IT contractors, and from what I have seen the only significant difference is that Ms. Swift is female and doesn't have gray hair."

In addition to those specific items, Judge Wong also pointed to more general conduct, including failing to meet and confer, and failing to make use of the stipulated case manager. She also found that the accounting motion and the section 271 motion were not necessary, and that the latter need not have been heard on any expedited basis. Jill's brief essentially ignores all this.

 Beyond all that, there is abundant evidence of Andrew Watters's treatment—more accurately, mistreatment—of his opposing counsel in his correspondence with them. It is bad enough that such correspondence occurs in any litigation. It is utterly inconsistent with a fundamental aspect of proper family law practice. "Family law cases are not supposed to be conducted as 'adversarial' proceedings. Quite the contrary, the goal is to *reduce* acrimony and adversarial approaches common to general civil litigation and, instead, to foster *cooperation* between the parties and their counsel with a view toward settlement short of full-blown litigation. [See Fam.C. §§2100 (b), 271(a) (sanctions for uncooperative conduct in family law cases); see also Cal. Atty. Guidelines of Civility & Professionalism § 19—'in family law proceedings an attorney should seek to reduce emotional tension and trauma and encourage the parties and attorneys to interact in a cooperative atmosphere, and keep the best interest of the children in mind']." (Hogoboom & King, *supra*, ¶ 1:56, pp. 1-17 to 1-18 (rev. # 1, 2010).)

The record is replete with correspondence from Andrew Watters to Ken's attorneys that contained abusive, rude, hostile, and/or disrespectful language, correspondence that Andrew Watters himself acknowledged was substantial evidence, when in the course of his closing argument he stated that: "Perhaps some unpleasant letters that could offend someone did substantially increase the cost of litigation." Perhaps it did indeed. A few illustrations should suffice:

—His November 22, 2006 letter to Mr. Merrill referring to Ken's nonappearance for deposition, which letter provided in pertinent part as follows: "Regarding your client's failure to appear *once again* for his continued deposition, we too regret that your client chose not to appear. As you know, we duly noticed his continued deposition for 11/20/06–11/22/06. Once again, you offer the same tired, old, and shopworn excuse. Your continued blustering about mutually agreeable dates, efficiency and promptness, and convenience is pathetic when your client's actions negate any semblance of cooperation. Talk is cheap. Actions speak louder than words. Your credibility is at stake here."

—His March 13, 2007 letter to Mr. Benoit included remarks that were rude, including "Enough already with the delays." Worse, his letter indicated that he did not believe Mr. Benoit—the person he described as "the dean of the

Family Law Bar"—telling him: "We don't accept your implication that you didn't already have [the Request to Inspect] . . . . Perhaps you didn't look hard enough, because we filed a Motion to Compel . . . in which I attached RTI Set one to my Declaration. Or you weren't counting that copy." And the letter ends with utter disrespect, with observations such as: "this seems like a case of the 'pot calling the kettle black' "; "In your last paragraph, your first suggestion is illusory. . . ."; and "Your last paragraph rings hollow."

—His September 11, 2008 letter to Mr. Johnson which, bad enough, insinuated untruthfulness: "We've noticed that, in the past, you have had some trouble keeping things straight. We also noticed that you tend to stretch things somewhat too far in the name of appearances." Worse, it accused Mr. Johnson of unethical conduct: "It's no surprise, then, that your letter of 8/7/08 appears to be an attempt to create a false and misleading exhibit for use at a later law and motion hearing so that your client can sit in court with a halo over his head, and so you can say 'look how many times Ken offered to settle!' That wouldn't surprise us at all, given your practice of attaching a large pile of exhibits to your declarations without any testimony from you concerning their truth."

Confronted with such correspondence, Andrew Watters's response below was hardly apologetic. As he indicated at one point, it might have been "unfortunate," but that was it. In his words, "So I should note if I caused undue emotional pain on the other side in terms of writing unpleasant letters, if I offended anyone, then that's unfortunate and certainly a learning process for me, but the fact is I am not on trial here. And, in any event, the attorneys on the other side—I'm sure they can handle it. Mr. Mike Merrill, I think, is a 35-year attorney, former Marine officer in Vietnam, has seen it all. Mr. Benoit is a 35- or 40-year family law lawyer. He's seen it all. Mr. Johnson was in the Navy, I believe. These are not attorneys not able to do lawyering because of unpleasant letters from a baby lawyer on the other side."

Jill's position on appeal is equally unrepentant where, referring to "the tone of some of [Andrew Watters's] written communications," she describes it as "the expressions (sometimes intemperate) of a young lawyer frustrated that Ken was systematically obstructing the search for the truth by his actions in resisting routine discovery, which is supposed to be self-executing. Ken and his attorneys then created a smokescreen that prevented the trial court from seeing the substance of the communications in context."[17] And oral argument was more of the same, to the point that Jill's counsel asserted that if we were

---

[17] In the course of Jill's argument on this point is this plea: "Jill's counsel's letters, as well as his arguments to the court, were easily within the bounds of free speech and zealous advocacy, even if 'not always coldly precise.' Even if his tone may have been marked by excitement or anger at the treatment his client had received at the hand of her husband (and the

to affirm Judge Wong's order and publish our opinion, it would have a "chilling effect" on advocacy in the family law arena.

We do not understand such an assertion, as what we have is a thorough and conscientious order made under section 271, which provides that "the court may base an award . . . on the extent to which the conduct of each . . . attorney furthers or frustrates the policy of the law to promote settlement . . . and . . . to reduce the cost of litigation by encouraging cooperation between the parties and attorneys." (*Id.*, subd. (a).) Section 271 says what it says. Judge Wong applied it. And we affirm her order under it.

Beyond that, we observe that while it is a family law statute that was the basis of Judge Wong's order, the impropriety of much of the conduct involved here extends beyond family law. Put conversely, we do not understand that family law practitioners are exempt from general notions of what is appropriate advocacy.

■ Andrew Watters's demeaning comments to opposing counsel were contrary to the California Attorney Guidelines of Civility and Professionalism promulgated by the State Bar in 2007 (Guidelines). (See *Fasuyi v. Permtex, Inc.* (2008) 167 Cal.App.4th 681, 702, fn. 10 [84 Cal.Rptr.3d 351].) These guidelines reflect that "attorneys have an obligation to be professional with . . . other parties and counsel, [and] the courts," which obligation "includes civility, professional integrity, . . . candor . . . and cooperation, all of which are essential to the fair administration of justice and conflict resolution." (Guidelines, *supra*, Introduction, p. 3.) Section 4 of the Guidelines further counsels that "An attorney should avoid hostile, demeaning or humiliating words," further providing in relevant part that: "An attorney's communications about the legal system should at all times reflect civility, professional integrity, personal dignity, and respect for the legal system. An attorney should not engage in conduct that is unbecoming a member of the Bar and an officer of the court. [¶] For example, in communications . . . with adversaries: [¶] . . . [¶] c. An attorney should not

treatment the attorney had received from Ken and attorneys), Jill should not have been punished for Andrew Watters' communications, which remained within the bounds of free speech and zealous advocacy."

To the extent that this asserts that Jill should not be responsible for the conduct of Andrew Watters, the law is otherwise. As King and Hogoboom distill it, "**Impact—attorney's misconduct imputed to client**: Thus, while §271 imposed duties upon *counsel* as well as counsel's client to cooperate in seeking to resolve the litigation [citation], those duties are enforced under the statute by means of a fees and costs award *against the party, not counsel*—even when the sanctionable conduct lies solely with a party's counsel. Fam.C. §271 'explicitly makes parties liable for the obstreperous actions of their counsel . . .' [*Marriage of Daniels, supra*, 19 Cal.App.4th at p. 1110; see also *Marriage of Quinlan*[, *supra*,] 209 Cal.App.3d 1417, 1422]." (Hogoboom & King, *supra*, § 14:237, p. 14-63 (rev. # 1, 2010).)

disparage the intelligence, integrity, ethics, morals or behavior of the court or other counsel, parties or participants when those characteristics are not at issue. [¶] . . . [¶] f. An attorney should avoid hostile, demeaning or humiliating words." (Guidelines, *supra*, § 4, pp. 4–5.)

We close this discussion with a reminder to counsel—all counsel, regardless of practice, regardless of age—that zealous advocacy does not equate with "attack dog" or "scorched earth"; nor does it mean lack of civility. (See, e.g., McGuire, *Reflections of a Recovering Litigator: Adversarial Excess in Civil Proceedings* (1996) 164 F.R.D. 283; Yablon, *Stupid Lawyer Tricks: An Essay on Discovery Abuse* (1996) 96 Colum. L.Rev. 1618, 1619 [describing the litigation climate as one "where over-aggressiveness is equated with zealous advocacy, and attorneys are expected to win at all costs"]; and Garth, *From Civil Litigation to Private Justice: Legal Practice at War With the Profession and Its Values* (1993) 59 Brook. L.Rev. 931.) Zeal and vigor in the representation of clients are commendable. So are civility, courtesy, and cooperation. They are not mutually exclusive.

### Jill Did Not Demonstrate That Ken's Conduct Warranted Sanctions

Jill has a final argument, however brief, that Ken's conduct was sanctionable pursuant to section 271. Again selectively setting forth facts that might favor her side, Jill apparently argues that Judge Wong *had* to find Ken's conduct sanctionable under section 271, that there was no evidence supporting a conclusion that Ken did not act in such a way as to trigger section 271. The record is otherwise.

Ken's presentation included a paragraph-by-paragraph refutation of Jill's fundamental claim that he failed to disclose properties. Moreover, and as Jill is forced to acknowledge, Ken agreed to no fewer than 10 stipulations between May 2006 and March 2008. As Jill's brief puts it, the first stipulation was in May 2006, followed by at least nine more: "In September 2006 and January 2007, Ken's first attorney, Michael Merrill, participated in two agreements by 'Stipulation and Order,' to sell millions of dollars of particular community assets and split the proceeds. [Citation.] [¶] Ken's second attorney, James Benoit, cooperated in seven separate stipulations regarding partial distribution or sale of specific community assets during his tenure—from January 2007 to March 2008. [Citation.] In March 2008, Ken's third attorney participated in two stipulations regarding the sale of two small community assets."

These stipulations, of course, concerned a great part of the community estate, as Jill recognized in her filing entitled specification of contested issues:

"[T]he evidence indicates that despite Wife's attorney's uncivil letters, the orderly settlement of this family law case proceeded with the parties stipulating to the disposition and division of some $30 million in assets during and subsequent to the Merrill Era." In short, the record before Judge Wong supports her conclusion that Ken's conduct did not violate section 271.[18]

## DISPOSITION

The order awarding sanctions and attorney fees is affirmed. Ken shall recover his costs on appeal.

Kline, P. J., and Lambden, J., concurred.

A petition for a rehearing was denied May 24, 2011, and appellant's petition for review by the Supreme Court was denied July 20, 2011, S193954.

---

[18] Jill's motion for judicial notice and augmentation of the record filed May 14, 2010, is denied.