Filed 3/12/25  Marriage of K.G.N. and K.A.N. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re the Marriage of K.G.N. and K.A.N. | |
| | D083291 |
| K.G.N., | |
| Appellant, | (Super. Ct. No. D529340) |
| v. | |
| K.A.N., | |
| Respondent. | |

APPEAL from a judgment of the Superior Court of San Diego County, Patricia Garcia, Judge.  Affirmed.

K.G.N., in pro. per., for Appellant.

Law Office of Beatrice L. Snider and Alexandria M. Jones, for Respondent.

Appellant K.G.N. (mother), a self-represented litigant, appeals from a dissolution judgment entered after a nine-day bench trial in proceedings with respondent, her former spouse K.A.N. (father), involving issues of custody and visitation, child and spousal support, breach-of-fiduciary-duty claims,

reimbursement for support and other overpayments, attorney fees and sanctions. The family court made lengthy, detailed findings and orders that are the subject of mother's challenges. Father contends mother waived and forfeited most of her challenges by failing to object or otherwise raise them in the family court proceedings, cite facts in the record, or provide reasoned legal analysis with authority. We agree with father that mother forfeited many of her challenges. To the extent mother has not forfeited her contentions, she has not demonstrated error or prejudice. We affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND[1]

*Underlying Family History, Family Court Proceedings and Mother's Bankruptcy*

Mother and father were married for approximately 15 years and have three children, one of whom, a son, was a minor at the time of trial. Father is an artist who generates income from royalties and art sale proceeds. When mother and father separated, the children were ages 14, 10 and 3, and remained primarily in mother's care. After filing for divorce, mother sought sole legal and physical custody of the children. She accused father of being inappropriate, abusive and incompetent to care for them, and would only agree to daytime visits between father and the children. A Family Code

---

[1] The background facts are taken from the family court's statement of decision to the extent they are uncontested, or in the light most favorable to the judgment. (See *Lopez v. Ledesma* (2022) 12 Cal.5th 848, 853.) We note some of the parties' page references to the reporter's and clerk's transcripts do not correspond with the actual pages, making it difficult to locate the matters they purport to cite.

section 730[2] custody evaluation eventually vindicated father, but mother was reluctant to accept the evaluator's findings, even at the time of trial.

The parties under a temporary stipulated custody order shared joint legal and alternate weekend custody of their son, with father having daytime visits that were intended to lead to Saturday overnight visits. The court also ordered the parties into conjoint therapy. Neither party followed the court's custody orders, however, and during the parties' 12-year separation, the children had only a handful of overnight visits with father.

Father has no relationship with his and mother's two daughters. The daughters, now adults, are very angry at him. They claim they never had a relationship with him nor do they want one; the sole reason they went on visits with him was to watch over their brother because they believed father was incapable of doing it himself.

Father's relationship with their son is in jeopardy. In the summer of 2021, their son cut off contact with father. Though mother denied problems with their son seeing father, she created a hostile attitude and environment against father, burdening the family with both physical and emotional safety concerns such that they greatly undermined father's relationship with their son. Their son went from fully and excitedly engaging with father at age three to rejecting visits with him in 2021.

Over the years, the family court proceedings between the parties resulted in a judgment and several orders and stipulations, specifically a December 7, 2015 findings and order after hearing; a December 28, 2015 judgment of dissolution; a June 10, 2016 stipulation and order re: financial issues; an October 23, 2017 stipulation re: division of credit card debts as well as reimbursements and characterization of father's separate property

---

2     Undesignated statutory references are to the Family Code.

3

artwork; and a December 27, 2018 partial judgment on reserved issues.[3] Some of these orders memorialized the parties' agreements concerning how to deal with father's artwork created during their marriage; that "community property artwork would be sold and the net proceeds would be divided between them."

More specifically, the parties agreed in the December 2015 judgment that effective September 2015, all of the income from community property artwork "shall constitute joint income to the parties and they shall each have a one-half interest in the same in the future." In June 2016, the parties stipulated that an identified set of father's work was community property. They agreed "to the confirmation and awarding of intellectual property rights" in an attached exhibit, which provided that "[mother's] interest in the community artwork . . . shall consist of the right to receive 50 [percent] of the net income received from [proceeds from sale of specified works, royalties from the sale of literary works, and licensing fees]." The June 2016

---

[3] The trial court incorporated by reference into its judgment the December 28, 2015 judgment, the June 10, 2016 stipulation and order, the October 23, 2017 stipulation and order, the December 27, 2018 partial judgment, and an April 11, 2023 stipulation regarding resolved issues and order. Though mother identified some of these judgments, orders and stipulations as trial exhibits and some of them are referenced in the parties' pretrial stipulation on resolved issues, only the April 11, 2023 stipulation on resolved issues, was included in the appellate record. Because mother asked that the December 2015 judgment (identified as trial exhibit 9) and the June 10, 2016 stipulation and order (identified as trial exhibit 11 or exhibit 423) be included in the clerk's transcript, we asked her to submit those exhibits to us. (Cal. Rules of Court, rules 8.122(a)(3) [with an exception not applicable here, "all exhibits admitted in evidence, refused, or lodged are deemed part of the record"], 8.224(d) ["At any time the reviewing court may direct the superior court or a party to send it an exhibit"].) The record indicates that while the exhibits were not admitted into evidence, the court took judicial notice of them.

4

stipulation contained detailed provisions concerning the intellectual property rights to father's works: "[Father] shall continue to be the sole owner of the copyright to all of his Artwork, whenever created, and shall retain all other intellectual property rights to the Community Artwork . . . ."

Although mother claimed she would follow the court's orders, in the past, she did not follow orders to discuss and agree upon decisions about their son's health, education and welfare or extracurricular activities. Rather, mother made assumptions and unilateral decisions, disregarding father and undermining his relationship with their son. Father supported his son's ambitions and desires; he did not object to their son's ongoing endeavors but did object to mother's disregard of his input and time with his son.

In May 2020, mother filed for Chapter 7 bankruptcy, claiming $122,797 in child and spousal support arrearages, when forensic experts calculated father's underpayment as $5,467. During that time, father double-paid mother spousal support, resulting in a $90,563 net overpayment. Father's bankruptcy counsel attempted to resolve the issue without success.

In March 2023, a family court services counselor made custody and visitation recommendations for the parties with respect to their son, including that the parties share joint legal custody, and mother would have primary physical custody with father having alternating weekend-day visits. That same month, the bankruptcy court denied mother's motion to convert to a Chapter 13 bankruptcy, specifically on the ground mother had engaged in bad faith conduct in taking inconsistent positions in that court with her positions in the family court proceeding, as well as by tactically avoiding litigating issues in family court so as to affect the bankruptcy case to the

detriment of creditors.[4]  As part of the bankruptcy, the bankruptcy trustee sold for $250,000 mother's interest in royalties for father's artwork and books granted to her in prior family court orders.

*Trial Stipulations and Evidence*

The matter proceeded in April 2023 to a multi-day trial on various reserved issues, including whether father had accurately reported and shared royalty and sales income from the community artwork.  Before trial, the parties entered into the following stipulations as to royalty payments and sales proceeds:

• "There is no issue as to any future interest of [mother] to share in any royalty payments to be received by [father] post November 30, 2022, since this issue has already been resolved pursuant to court order in [mother's] bankruptcy case . . . ."[5]

• "There is no issue as to the specification of which items of art were created during marriage to which [mother] has the right to receive 50 [percent] of the net sale proceeds.  The lists attached to the June 10, 2016 stipulation and order on financial issues and partial judgment, filed December 27, 2018[,] shall be considered as dispositive on the issue of which

---

[4]     Father asks us to take judicial notice of the bankruptcy court's March 15, 2023 order denying mother's motion to convert her bankruptcy case from a Chapter 7 to a Chapter 13.  The family court had admitted this order into evidence, and considered it in issuing its findings and orders.  We treat father's motion as one to augment the record or alternatively augment the record on our own motion with the referenced order.  (Cal. Rules of Court, rule 8.155(a)(1) [reviewing court may at any time either on the motion of a party or its own motion order the record augmented to include any document filed or lodged in the superior court].)

[5]     Throughout this opinion we omit unnecessary capitalization when quoting from the record.

6

works of art from which [mother] has entitlement to receive 50 [percent] of the net proceeds. (Note: There is a dispute as to whether [mother] has an ownership interest in the artwork created during marriage as opposed to a limited right to receive one half the net sale proceeds.)"

- "[Mother] shall be deemed to have had constructive receipt of all royalty and art sale proceeds held in trust by [father] during the pendency of her bankruptcy action from January 20, 2020[,] until November 20, 2022. This arrangement that [father] held these funds in a 'trust' mgbgyaccount [*sic*] was pursuant to an understanding with the bankruptcy trustee. As per the order of the bankruptcy court . . . , [mother's] prospective rights ]to receive her share of royalty income were sold by the trustee in order to pay her creditors."

- "The proceeds currently held in trust by [father] representing [mother's] one half share royalty income and net proceeds from the sale of artwork created during marriage are subject to the jurisdiction of the bankruptcy court as to the monies received on or before November 30, 2022. Pursuant to the bankruptcy court order approving sale of [mother's] interest in certain royalty income, the amount earned after November 30, 2022[,] for her share of the net income received for the sale of artwork created during marriage was abandoned by the trustee and is owned by [mother]."

The parties disputed whether mother had an ownership interest in the artwork created during the marriage as opposed to a limited right to receive one half the net sale proceeds. At trial, father testified that he owned the physical artwork that he created during the marriage but was obligated to pay mother a percentage of the net income from that artwork, and had done so since court judgments were entered in 2015, 2016 and 2017. He testified that during the pendency of mother's bankruptcy, he placed the income from

7

community artwork into a trust, which at the time of trial contained approximately $243,800.[6] He did not object to continuing to pay mother her share of the net income stream from community artwork sales, offering he had held to his court-ordered obligation. Father testified that in 2016, he disclosed to mother in an income and expense declaration that he had entered into a business partnership with Dr. Jungmiwha Bullock, who in June of that year also attended a mediation to explain her role in their company. He testified that he and Dr. Bullock formed their LLC May 2016, only a few weeks to a month before he disclosed the existence of the corporation to mother. Father and Dr. Bullock married in April 2019.

Both parties presented evidence from forensic business valuation and accounting experts on issues related to father's art business and monies owed to mother, as well as father's support overpayments to mother. The experts worked together to create a joint report (exhibit 449), including to address father's income available for support.

Father presented another forensic accountant, Henry Kahrs, to testify about the failure to allocate community art sale costs or expenses and the value of Dr. Bullock's services, resulting in mother's overcompensation for the sales. Based in part on information received from the parties' other accountant experts, Kahrs prepared a report showing that from 2016 to 2021, $44,889.62 should have been deducted from the share of sales, one-half of

---

[6] At trial, father asked the court to consider using this source of funds for payments mother owed to him, as well as the additional $250,000 in funds held by the bankruptcy trustee from sale of royalties mother previously owned. Mother testified that one of their judgments required the parties to open a joint bank account for art proceeds, which did not happen, but she conceded the issue was resolved by their June 2016 stipulation to engage a bookkeeper or accountant to resolve what father owed her with respect to the community artwork.

8

which should have been mother's portion. He testified that mother received the benefit of increased cash flow during that period stemming from Dr. Bullock's work, even after Dr. Bullock received a commission. Kahrs, who was familiar with intellectual property and copyright litigation, gave his opinions based on "court-guided case law on how to allocate expenses" (asserting it "picks it up exactly the way I do it") as well as the parties' June 2016 stipulation that father owned the community artwork and mother owned a right to an income stream from its sale.[7]

Father also presented a vocational evaluator who had interviewed mother in 2014. The evaluator testified about the job market available to mother, mother's ability to work, and what mother would have earned had she followed the evaluator's recommendations. The court heard testimony from father's and Dr. Bullock's respective bankruptcy attorneys. Father's bankruptcy counsel explained he had advised father to create the trust account for community art income and royalties given questions raised about whether he should pay it to the bankruptcy trustee. He testified he had worked with father's forensic accountant to determine monies received from 2018 to 2020, and set up an account so the trustee's and mother's counsel had access to the information. He also explained that the bankruptcy judge had abstained from addressing certain issues—including as to the ownership of artwork—so as to allow the family court to decide them. Counsel testified as to those issues that "[t]he bankruptcy court isn't going to rule on those. And that if there is a determination later in the family court, then the bankruptcy

---

[7] Kahrs testified he allocated insurance, office supplies, software, and a minor amount of taxes, licenses and utility costs, but not dues and subscriptions, job supplies, legal and professional services, meals, entertainment or travel.

court would take those orders from family court and effectuate them, as necessary."

*Court's Findings and Orders*

In August 2023, the court issued its judgment with detailed findings and orders. Before doing so, it explained that its findings "encompass a broader context and point of view and are guided by the rule of law, as well as the evidence that was presented and the weight the court gave to certain testimony and the credibility that the court found in each of the witnesses, including each of the parties."

With regard to custody and visitation, the court found in part that both parties had contributed to the negative relationships between father and their children but "given mother's greater influence over the children she [bore] primary responsibility." The court observed that mother claimed she was unaware of father and son's lack of contact, finding this "demonstrat[ed] little to no interest in her son's relationship with his father." It found mother "was guarded, reluctant to answer questions, and at times, nonresponsive and defensive" and that "[g]enerally, [mother] was not credible." The court found mother "has created or allowed a hostile attitude and environment against father," and that it did "not believe mother or the daughters that mother has never expressed negativity towards father in the home or in the presence of [their son]."

The court ordered father to pay guideline child support for a specified time. It reduced and terminated spousal support in a step-down fashion, and terminated jurisdiction over mother's spousal support as of April 2024. It ordered mother to reimburse father for $96,030 in spousal support that father had overpaid in 2020 and 2021.

10

With respect to art sales income, the court, referring to the judgments, stipulations and orders it had incorporated by reference (see footnote 3, *ante*), found that "there are no disputes as to the character and division of the community property royalties and art sale proceeds . . . [and] [t]he only dispute is whether mother has received the correct amount owed to her under these orders." The court found the orders "memorialized the parties' agreement that certain community property artwork would be sold and the net proceeds would be divided between them." The court "inferred that father would retain exclusive possession and control of the physical art pending sale, thereby ensuring the integrity of the art, his work and protecting all his copyrights and other intellectual property."

The court found father did not breach any fiduciary duties owed to mother with respect to operation and management of community property artwork sales proceeds in which mother had an interest. Reciting and reconciling the overpayments and underpayments, it found father had overpaid mother $14,281 for her share of the royalties and net sales proceeds, and ordered mother to reimburse that sum to father forthwith.

Based on detailed findings concerning mother's bankruptcy case and her bad faith conduct, failure to comply with custody and visitation orders, creation of a hostile environment against father, and delays with regard to father's custodial time with the children, the court ordered mother to pay father $75,000 in sanctions. It ordered father to pay mother $75,000 in attorney fees and costs.

Mother filed this appeal.

11

## DISCUSSION

### I. *Appellate Review Principles*

It "is a fundamental principle of appellate procedure that a trial court judgment is ordinarily presumed to be correct and the burden is on an appellant to demonstrate, on the basis of the record presented to the appellate court, that the trial court committed an error that justifies reversal of the judgment." (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608-609; *Conservatorship of Ben C.* (2007) 40 Cal.4th 529, 544, fn. 8; *In re Marriage of Obrecht* (2016) 245 Cal.App.4th 1, 8.) We also presume judicial duty is properly performed; that the court below knows and applies the correct statutory and case law, and will ignore material it knows is incompetent, irrelevant, or inadmissible. (*In re Marriage of Davenport* (2011) 194 Cal.App.4th 1507, 1526.)

It is mother's burden to "demonstrate error through reasoned argument, citation to the appellate record, and discussion of legal authority." (*Bullock v. Philip Morris USA, Inc.* (2008) 159 Cal.App.4th 655, 685.) Thus, in considering whether she has met that burden, we disregard factual assertions unsupported by citations to the record and legal arguments unsupported by citations to legal authority. (*Tanguilig v. Valdez* (2019) 36 Cal.App.5th 514, 520.)

Further, an inadequate record "will frequently be fatal to a litigant's ability to have his or her claims of trial court error resolved on the merits by an appellate court." (*Jameson v. Desta, supra,* 5 Cal.5th at p. 608.) In other words, " '[f]ailure to provide an adequate record on an issue requires that the issue be resolved against [the appellant].' " (*Id.* at p. 609.) The above principles apply to mother even though she is self-represented, as such litigants are " ' "entitled to the same, but no greater, consideration than other

12

litigants and attorneys." ' " (*Grabowski v. Kaiser Foundation Health Plan, Inc.* (2021) 64 Cal.App.5th 67, 75, fn. 2; *Tanguilig v. Valdez, supra*, 36 Cal.App.5th at p. 520.)

If mother establishes error, she must also provide some explanation as to how she was prejudiced by it. We will not reverse a judgment absent a showing that the appealing party suffered prejudice, and mother must make that showing with cogent argument and legal analysis. (*F.P. v. Monier* (2017) 3 Cal.5th 1099, 1107-1108; *Audish v. Macias* (2024) 102 Cal.App.5th 740, 751.)

## II. *Forfeited Issues*

We begin with father's contention that mother has forfeited many of the issues she raises. He maintains mother failed to object or otherwise raise them in the family court proceedings, cite facts in the record, or provide reasoned legal analysis with authority in her opening appellate brief. As we explain, we agree with many of his arguments.

Mother's briefing is deficient in various respects. In the nine issues she raises, she purports to set out the standard of this court's review, but does not cite authority to support her assertions. Her briefing in many respects ignores the precept that all evidence must be viewed in favor of the court's order or judgment. (Accord, *In re Marriage of Davenport, supra*, 194 Cal.App.4th at p. 1531.) "This precept is equally applicable here, where [the family court] issued a statement of decision: 'Where [a] statement of decision sets forth the factual and legal basis for the decision, any conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision.' " (*Ibid.*) The observation in *Davenport* is apt: "What [mother] attempts here is merely to reargue the 'facts' as she would have them, an argumentative presentation

13

that not only violates the rules noted above, but also disregards the admonition that she is not to 'merely reassert [her] position at . . . trial.' " (*Ibid*.) "[S]uch 'factual presentation is but an attempt to reargue on appeal those factual issues decided adversely to [her] at the trial level, contrary to established precepts of appellate review. As such, it is doomed to fail.' " (*Ibid*.)

We proceed in any event to explain why mother has either forfeited her contentions or why she has not shown error or prejudice. We separately address for clarity the issues related to father's artwork, issues for which mother attempts some reasoned legal argument, and the court's sanctions order.

A. *Child Custody and Visitation*

The family court found father "to be the parent more likely to allow the child frequent and continuing contact with the other parent." However, given father's limited contact with their son, it ordered the parties to continue to share joint legal custody. Following detailed findings concerning the parties' relationship with their children, as well as mother's credibility and her actions in undermining father's relationship with their son, the court then modified the family court services recommendation "to add that the parties shall share joint legal custody, but in the event of any disagreement, father shall have the authority to make the final decision."

Mother contends the order essentially shifted their custody from joint to de facto sole custody, which failed to recognize the parents' rights and child's interests. She maintains the court "did not adequately consider the dynamics of the parental interactions and the historical context of the children's upbringing" and did not sufficiently evaluate "the impact [its] decision would have on the children's welfare and the existing parental

14

roles." According to mother, the "order was an abuse of discretion because it might have granted [father] full custody rights by giving him the authority to make the final decision on any disagreement" and the court "improperly substitut[ed] its own parental judgment over the interest of the then 15-year-old minor child, who has shown great hesitation in being involved with his father." She asks that the judgment be reversed "with both parties having joint custody and the court retaining jurisdiction to decide any disagreement."

We agree the contention is forfeited for mother's failure to provide legal authority and reasoned argument in support of these specific arguments, including to support her assertions about the applicable standard of review. Absent "any pertinent or intelligible legal argument," we are not "required to consider alleged error where the appellant merely complains of it . . . ." (*Berger v. Godden* (1985) 163 Cal.App.3d 1113, 1119.)

For another narrow proposition, mother cites a single case, *Coursey v. Superior Court* (1987) 194 Cal.App.3d 147. That case stated that "Common experience tells us we may not merely assume without proof that a [parent] can reasonably compel a teenaged [child] to visit [the other parent] against the [child's] strong wishes." (*Id*. at p. 155.) *Coursey* involved a mother adjudged in contempt for willfully failing to comply with a minute order awarding specified visitation with her 14-year-old daughter and husband. (*Id*. at p. 149.) The Court of Appeal annulled the contempt order, holding there was no evidence the mother either had the ability to comply with the order if her daughter did not wish to attend or that the mother willfully violated the order. (*Id*. at pp. 155, 156-157.) In particular, the court observed no party presented evidence on the mother's ability to control her daughter, her relationship with the daughter, or that the mother could discipline and

15

control the daughter if she wanted to. (*Id*. at p. 155.) *Coursey* has no bearing on the present order granting father final decisionmaking on issues concerning their son in the event of a disagreement.

To the extent mother has not forfeited the challenge, we conclude she has not demonstrated error or prejudice as she must. (*F.P. v. Monier, supra,* 3 Cal.5th at pp. 1107-1108.) The court found father to be the parent more likely to promote contact with mother, a finding mother does not address in any meaningful way. Mother also disregards the court's findings concerning the custody evaluator's vindication of father against mother's accusations and her reluctance to accept the evaluator's findings, her role in "creat[ing] or allow[ing] a hostile attitude and environment against father," and her actions that "greatly undermined father's relationship with his son." She ignores the family court's credibility call against her, which we may not reweigh or revisit in our review. (*In re Marriage of Diamond* (2024) 106 Cal.App.5th 550, 567; *In re Marriage of Boswell* (2014) 225 Cal.App.4th 1172, 1175.)

As for prejudice, mother has not shown father has at any time or since the court's ruling made decisions concerning their son that harmed her interests. It is mother's burden to demonstrate affirmatively that an error caused a miscarriage of justice, but here, any claim of prejudice is purely speculative. " 'Mere *speculations* of prejudice are insufficient . . . .' " (*Harmony Gold U.S.A., Inc. v. County of Los Angeles* (2019) 31 Cal.App.5th 820, 838, quoting *People v. Singh* (2015) 234 Cal.App.4th 1319, 1330-1331.)

B. *Reliance on Dr. Doyne's Testimony to Order Services Upon Violating the Family Court's Orders*

At trial, the court heard testimony from Dr. Stephen Doyne, a psychologist expert in parental estrangement or alienation. He had reviewed documents including the parents' declarations, family court services reports,

16

the section 730 evaluator's reports, and various court orders. Dr. Doyne had interviewed father, but had not met or interviewed mother or any of the children. He testified based on facts related by father and what he reviewed that the circumstances in the parties' case were consistent with severe alienation. He explained potential remedies he had used in situations of estrangement or alienation: in severe cases, he had recommended outside intervention in specifically designed programs with intense therapy such as Turning Point in New York City, or a residential treatment program, Adolescent Growth, in Los Angeles. He testified that in another case, the court simply changed custody.

Following trial, the court ordered as part of its custody and visitation ruling that "absent written agreement, failure to comply with the court's orders constitutes a change of circumstance which may justify an intensive program, such as Turning Point for Families or Adolescent Growth and/or a change of primary physical custody to the father."

Mother challenges this ruling, seemingly arguing it lacks support by substantial evidence. More specifically, mother asserts the ruling "is contingent upon the accuracy and reliability of the information presented by [Dr. Doyne]" but his testimony "was reported to have some elements of hearsay and uncertainty regarding its direct observations." Pointing out Dr. Doyne had not seen her or the parties' son, she suggests Dr. Doyne's testimony was derived from "potentially biased interpretations," and argues it contained "discrepancies and uncertainties" as well as misstatements about their son's age when he exhibited anxiety. According to mother, given the expert's "reliance on potentially incorrect or incomplete information," it "fails to meet the threshold of substantial evidence."

These arguments entirely lack citation to authority or reasoned legal argument. " '[W]e may disregard conclusory arguments that are not supported by pertinent legal authority.' " (*Audish v. Macias*, *supra*, 102 Cal.App.5th at p. 751; see also *Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 52 ["We are not required to examine undeveloped claims or to supply arguments for the litigants"]; *Menges v. Department of Transportation* (2020) 59 Cal.App.5th 13, 27 [" ' "Mere suggestions of error without supporting argument or authority other than general abstract principles do not properly present grounds for appellate review." [Citation.] "Hence, conclusory claims of error will fail" ' "].) We are not bound to develop her arguments. (*In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 830.)

Additionally, to the extent mother asserts an evidentiary challenge, she did not object below to Dr. Doyne's testimony on hearsay grounds, only on grounds that counsel's questions to Dr. Doyne assumed facts not in evidence, were vague as to time, or were outside the scope of cross-examination. For that reason, mother has forfeited the challenge. (*Lopez v. Ledesma*, *supra*, 12 Cal.5th at p. 866 [" '[A] reviewing court ordinarily will not consider a challenge to a ruling if an objection could have been but was not made in the trial court' "]; *Audish v. Macias*, *supra*, 102 Cal.App.5th at p. 755; *Tanguilig v. Valdez*, *supra*, 36 Cal.App.5th at p. 520.)

Even if mother had somehow preserved a substantial evidence challenge, her arguments improperly would have us revisit the credibility or weight of Dr. Doyne's testimony, which is outside our role as a reviewing court. (*Slone v. El Centro Regional Medical Center* (2024) 106 Cal.App.5th 1160, 1173; *People v. Kirvin* (2014) 231 Cal.App.4th 1507, 1514 ["It is 'not the role of this court to redetermine the credibility of experts or to reweigh the

18

relative strength of their conclusions' "].)  Finally, the family court's decision as to the parties' participation in treatment programs or change in physical custody was contingent on future violation of its orders.  Mother has not shown either that the court has since found a violation, changed primary custody based on such a violation, or directed the parties to treatment.  On this record, she cannot demonstrate prejudice.

C.  *Spousal and Child Support Orders*

The court made detailed findings concerning the parties' earnings and income, mother's employment and receipt in 2013 and 2015 of three admonitions to become self-supporting (see *In re Marriage of Gavron* (1988) 203 Cal.App.3d 705),[8] mother's failure to reinvest community proceeds, additional debt she had incurred, and her failure to live within her means.  It found father had been paying spousal support for 12 years, and had paid mother $514,000 from October 2015 through December 2022.  Monthly spousal support was currently set at $6,000.  Summarizing mother's work

---

[8]    *In re Marriage of Gavron*, *supra*, 203 Cal.App.3d 705 held a supported spouse could not have support modified or terminated based on her failure to seek employment without the trial court giving "reasonable advance warning that after an appropriate period of time the supported spouse was expected to become self-sufficient or face onerous legal and financial consequences."  (*Id.* at p. 712.)  The warning has since been codified at section 4330.  (*In re Marriage of Schmir* (2005) 134 Cal.App.4th 43, 55-56.)

history and the vocational evaluator's testimony,[9] the court found "mother has refused to accept the changes that come with a separation and divorce" and "has not made reasonable efforts to pursue an education and career, that today would have provided her with strong earnings and the ability to become self-supporting." The court further found mother "failed to reinvest her share of the community assets," "lost her right to receive one half of the community's ongoing royalties to the bankruptcy estate," "failed to live within her means" and "has been irresponsible in handling her financial affairs."

The court found mother's monthly imputed wages were $5,000 and added $634 per month in average community art sales. It found mother had approximately $8,000 in reasonable expenses. It found father had $3,708 in monthly W-2 income, and $27,832 in other monthly taxable income. Based on these and other findings, the court ordered that effective May 1, 2023, father would pay $2,529 in guideline child support each month until further court order or until their child reached age 18, or until high school graduation or age 19, whichever occurred first. It ordered spousal support reduced and terminated in a "step-down fashion, to give mother time to transition." Specifically, "Effective May 1, 2023[,] father shall pay to mother spousal support of $3,000 per month until either party's death, mother's remarriage

---

[9] The court found the vocational evaluator had identified three fields that mother, who was college educated, could pursue: esthetician work, teaching, and work as an administrative assistant. It found mother chose to train as an esthetician but never worked in that capacity; rather she volunteered her time at the children's school and worked as a substitute teacher from time to time. The court found the evaluator "testified that had mother pursued a teaching credential in 2015, today she would be earning approximately $66,000 per year; had mother pursued a nursing degree today she could be earning $95,000 per year; had mother pursued work as an administrative assistant she could be earning $54,000 per year. Teaching and nursing positions would also garner benefits."

or April 30, 2024, whichever occurs first. [¶] . . . If not terminated earlier, spousal support and the court's jurisdiction over the ability to extend or modify any spousal support award to mother shall terminate on April 30, 2024."

Asserting (without authority) that we review issues concerning spousal and child support for abuse of discretion, mother contends the court abused its discretion in reducing and then terminating spousal and child support. She argues the court did not "fully and properly evaluat[e] all relevant factors and evidence" including "substantial changes in circumstances . . . , the child's best interests, and [her] earning capacity," which she argues are "all critical under [section] 4320."

According to mother, the court failed to prioritize their child's best interests and needs, but instead "predominantly focused on [her] potential to increase her earnings." She maintains the court ignored "crucial vocational evaluations which clearly indicated that without further training, [her] earning capacity would remain limited." Mother argues the court ignored her contributions to the marriage, which justify substantial spousal support. She says it disregarded changes in circumstances affecting her financial ability, including one daughter's emancipation and college enrollment, father's living arrangements with Dr. Bullock, his fluctuating income that requires income averaging, her loss of book royalties, and the "skyrocketing cost of living." Mother asks us to "reevaluate the evidence," "recalculate, and, if justified, reinstate appropriate spousal and child support," and "reverse or reprimand the trial court's order" as an abuse of discretion.

Apart from the fact that virtually all of mother's arguments are made without citation to authority or legal analysis, they view the evidence in the light most favorable to her, contrary to the applicable review standards

21

summarized above. Further, though mother is correct that we review the court's support orders for abuse of discretion (*M.S. v. O.S.* (2009) 176 Cal.App.4th 548, 553 [child support]; *In re Marriage of Berman* (2017) 15 Cal.App.5th 914, 919 [spousal support]), she does not properly apply that standard. Under it, we do not reevaluate the questions anew, but decide " ' "whether the court's factual determinations are supported by substantial evidence and whether the court acted reasonably in exercising its discretion." ' " (*M.S.*, at p. 553; *Berman*, at p. 919.) We do not substitute " 'our own judgment for that of the trial court, but determine only if any judge reasonably could have made such an order.' " (*M.S.*, at p. 553; see also *Berman*, at p. 919.) " ' "Because trial courts have such broad discretion, appellate courts must act with cautious judicial restraint in reviewing these orders." ' " (*In re Marriage of McLain* (2017) 7 Cal.App.5th 262, 269.)

Importantly, "[w]hen reviewing for substantial evidence, 'all conflicts must be resolved in favor of the prevailing party, and all legitimate and reasonable inferences must be indulged in order to uphold the trial court's finding. [Citation.] In that regard, it is well established that the trial court weighs the evidence and determines issues of credibility and these determinations and assessments are binding and conclusive on the appellate court.' " (*In re Marriage of Berman, supra,* 15 Cal.App.5th at p. 920.)

1. *Spousal Support*

Mother's arguments concerning the court's spousal support order are unavailing. She does not outline the section 4320 factors, or acknowledge that as part of the court's analysis it may consider "any other factors pertinent to a just and equitable award." (*In re Marriage of Deluca* (2020) 45

22

Cal.App.5th 184, 195; § 4320, subd. (n).)[10] The court observed that since their separation, and for almost as many years as the marriage lasted, father has paid mother a significant amount of spousal support. And it found mother has not been responsible with the funds she has received or her efforts to become self-supporting despite numerous warnings to do so. The court's order was plainly intended to provide mother an incentive to develop her own skills and career. The circumstances, in our view, reasonably warranted the court's step-down and eventual termination of support in April 2024. Mother has not established the court abused its discretion.

2. *Child Support*

As for child support, mother fails to recognize that guideline support, which is based on applying a mathematical formula to the parents' incomes, is presumptively correct. (*M.S. v. O.S.*, *supra*, 176 Cal.App.4th at p. 553; see §§ 4052, 4053, subds. (e), (k), 4055; *In re Marriage of Macilwaine* (2018) 26 Cal.App.5th 514, 528.) And as stated above, we presume the court properly applied the formula in figuring the guideline. (*Heidi S. v. David H.* (2016) 1 Cal.App.5th 1150, 1175 [" ' " '[A] trial court is presumed to have been aware of and followed the applicable law' " ' "]; *In re Marriage of Davenport*, *supra*, 194 Cal.App.4th at p. 1526.) Mother does not rebut that presumption.

Finally, termination of child support is governed by section 3901, which provides that the duty of child support "continues as to an unmarried child

---

10    There are other problems with mother's analysis. For example, a change of circumstance inquiry for a spousal support order focuses on the change since the "last order." (*In re Marriage of West* (2007) 152 Cal.App.4th 240, 246.) Similarly, modification of a child support order depends on a material change in circumstances since entry of the last support order. (*In re Marriage of Hein* (2020) 52 Cal.App.5th 519, 528.) Absent the previous support orders, we cannot determine whether substantial evidence supports the family court's challenged decisions on spousal support.

who has attained 18 years of age, is a full-time high school student, unless excused [by a documented medical condition], and who is not self-supporting, until the time the child completes the 12th grade or attains 19 years of age, whichever occurs first." (See also *In re Marriage of D.H. and B.G.* (2023) 87 Cal.App.5th 586, 589.) The court's order terminating child support complies with this statute, under which father's child support obligation terminates as a matter of law. (*Id*. at p. 593.) Even if mother did not forfeit her contentions, we would conclude the court did not abuse its discretion in that respect.

D. *Order that Mother Reimburse Father $96,030 in Overpaid Spousal Support*

At trial, father's forensic expert testified that she and mother's expert had agreed father had paid double the amount of spousal support—an additional $6,000 monthly over and above his court-ordered $6,000 amount—to mother starting in 2020 and until the end of 2021, and that the total overpayment was $96,030. Thus, mother's counsel acknowledged in closing arguments that there was "no dispute that [father] overpaid the support." Her counsel stated mother had alerted father about it but went on to acknowledge, "However, he overpaid it. He's entitled to that back. There's no dispute about that" and "it will be paid back to him."

In ruling on that issue, the family court found that the parties' respective forensic experts had "worked cooperatively," summarizing their findings in a report in which they "agreed on most of the figures and calculations." The court "pursuant to both forensics' testimony and their report of arrearages" found that "father overpaid spousal support to mother in the amount of $96,030 during the period 2020-2021" and ordered that mother reimburse father that amount "forthwith." The court further ordered

24

the sum "be netted out against the credits and debits" elsewhere described in its order.

Mother does not address her counsel's concession or attempt to summarize the forensic expert testimony and evidence on the point. Rather, she contends the court abused its discretion by ordering her to immediately reimburse father $96,030 for the spousal support overpayment because it failed to consider the parties' prior "established pattern," namely that when father made an overpayment mother would notify him and he would make an adjustment in subsequent payments to address the error. Mother asserts that after she notified father of the overpayment, he acknowledged but failed to rectify it despite her additional reminders and "despite [him] being in a superior position to monitor and adjust the disbursements from his accounts." According to mother, she had a reasonable expectation father would adjust his overpayments without need for reimbursement and this circumstance "should have been a critical consideration in the court's decision." Mother characterizes father's conduct as "negligence" and says that negligence, combined with their "established pattern of prior conduct, should exempt [her] from the obligation to reimburse the overpayments immediately."

We agree with father that mother forfeited these claims by failing to raise them below, instead conceding she would reimburse him for the overpayments. (See, e.g., *JJD-HOV Elk Grove, LLC v. Jo-Ann Stores, LLC* (2024) 17 Cal.5th 256, 270; *San Diego Municipal Employees Assn. v. Superior Court* (2012) 206 Cal.App.4th 1447, 1462 [" 'Under familiar general rules, theories not raised in the trial court may not be raised for the first time on appeal' "]; *GRFCO, Inc. v. Superior Court* (2023) 89 Cal.App.5th 1295, 1313.) "[A]n appellant waives his right to attack error by expressly or implicitly

25

agreeing or acquiescing at trial to the ruling or procedure objected to on appeal." (*In re Marriage of Broderick* (1989) 209 Cal.App.3d 489, 501.)]

Setting aside the forfeiture, we would still reject the claim. Mother's first argument on this point is supported by an Arkansas case, *White v. White* (2009) 2009 Ark.App. 790. She claims that in that case, overpayments were deemed voluntary even though the party who had overpaid testified they were neither voluntary nor gifts. Mother maintains based on *White* that father's continued overpayments after being notified about them should be treated as voluntary and not subject to reimbursement. We are not persuaded. Out-of-state authorities do not bind us. (*People v. Troyer* (2011) 51 Cal.4th 599, 610; *Christ v. Schwartz* (2016) 2 Cal.App.5th 440, 447, fn. 2.) Mother does not explain in any meaningful way why we should follow Arkansas law, particularly where spousal support is governed by California statutes (§§ 4300-4360). She does not engage in any reasoned legal argument applying California statutory or case law principles applicable to a spouse's overpayment of spousal support. We have no basis to conclude the court abused its discretion by not considering the parties' purported "established pattern[s]" or "historical behavior" based on their past conduct.

Mother further argues, citing *Roesch v. De Mota* (1944) 24 Cal.2d 563, 572, that "[a]t the very minimum, [father's] continued payments constituted a waiver of his right to seek reimbursement because his overpayments were knowing and intentional." *Roesch*, a case involving usurious promissory notes and whether plaintiffs could maintain a usury defense (*id.* at pp. 565-566, 572) does not demonstrate error. The case refers to the general proposition that a waiver "rests upon intent" and "is the intentional relinquishment of a known right after knowledge of the facts." (*Id.* at p. 572.) But as noted by the family court in this case, *both* parties' forensic experts

26

attested to father's spousal support overpayments, testimony that the court plainly found credible. The forensic expert testimony constitutes substantial evidence supporting the court's ruling. Such testimony likely explains why mother did not make her challenge below, which forfeits the point.

III. *Community Property Art Sales Income, Royalties, and Overpayments and Mother's Claim that Father Breached His Fiduciary Duty*

Mother took the position at trial that father had breached his fiduciary duty to her by not properly sharing income from the artwork owned by the community. She asserted a 50 percent commission and other expenses from father's art sales were "not appropriate" based on the breach. She asked that the court award 100 percent of the income to her.

At trial, father's accounting expert testified that with regard to product sales, there were always associated costs. Based on information the expert had obtained from father, she apportioned the cost of materials to particular sales. The expert acknowledged that mother's position was that such costs for materials or shipping should not be deducted from the gross receipts. She explained that from the gross art sales after deducting costs, 50 percent went contractually to Dr. Bullock and 50 percent went to father's company; the latter 50 percent was the net amount split between father and mother.

As summarized above, in its judgment after trial, the family court stated that in prior judgments, stipulations and orders in the case,[11] the parties had "memorialized [their] agreement that certain community property artwork would be sold and the net proceeds would be divided between them." The court "inferred that father would retain exclusive

---

[11] These are the December 28, 2015 judgment of dissolution, the June 10, 2016 and October 23, 2017 stipulations and orders, the December 27, 2018 partial judgment on reserved issues, and the April 11, 2023 stipulation and order.

27

possession and control of the physical art pending sale, thereby ensuring the integrity of the art, his work and protecting all his copyrights and other intellectual property." It observed that no party disputed the gross income generated by the sale of community property art, but mother disputed whether she received the correct amount owed to her under the orders.

The court found that mother had received notice of father's partnership with Dr. Bullock in May 2016, when it became operative. It summarized Dr. Bullock's work for father's company in, among other things, marketing, promoting and selling father's art, and found that during their partnership, father's profitability had increased. It found "it would not be a breach of fiduciary duty for father to reasonably compensate Dr. Bullock for her services to the extent they do not exceed market value." Referring to particular trial exhibits, the court found the amount of costs of goods sold were "reasonable and necessary expenses for the creation and sale of [father's] art." It further found the additional expenses allocated between the community and separate and deducted from gross income, were "reasonable and necessary expenses to maintain the overhead of father's business."

The court rejected mother's claim of breach of fiduciary duty, ruling "the evidence was overwhelming in support of father's position that he did not breach his fiduciary duties owed to mother" and that father "fulfilled his fiduciary duties to mother in the operation and management [o]f the community property artwork in which mother has an interest in the sale proceeds." It found without merit mother's claim that father had misappropriated monies. It found the total amount of income owed to mother from 2016 to 2022 was $450,843, that mother had received $442,679 from father resulting in an $8,164 underpayment, but based on forensic accountant Kahrs's report, father had overpaid her by $22,445 for overhead

28

expenses. The court ruled that father had thus overpaid mother $14,281 based on the existing orders in the case.

The court ordered that father "shall have the exclusive possession, management and control of the community property artwork, pending its sale, except to the extent prior orders have awarded mother physical possession of any other community property artwork."

A. *Breach of Fiduciary Duty*

Mother contends the family court erred by deciding father did not breach his fiduciary duties to her related to his artwork sales. She asserts father did not disclose that he had entered into a business partnership with Dr. Bullock, paying Dr Bullock commissions and reimbursements for overhead expenses and reducing mother's share of the proceeds. She characterizes father's action as "self-dealing through his current wife, which adversely impacted [mother's own] interest in community property." According to mother, the family court failed to properly apply fiduciary duty standards that require a managing spouse to act with the highest good faith and fair dealing towards the non-managing spouse. She maintains the court did not adequately consider whether father was transparent and fair in handling his art sales and commissions paid to Dr. Bullock.

Mother asks this court to "reevaluate whether [father's] actions constitute self-dealing and if these actions were justifiable under any standard of fiduciary responsibility" and make "a thorough analysis of whether the financial arrangements with Dr. Bullock were made in the best interest of both parties sharing the community property or primarily served [father's] interests." Though mother asserts we must evaluate the issue and record de novo, she cites no authority for that proposition.

29

While the existence and scope of a fiduciary duty is a question of law (*In re Marriage of Kamgar* (2017) 18 Cal.App.5th 136, 144), " 'the factual background against which we [answer that question] is a function of a particular case's procedural posture.' [Citation.] Thus, to the extent the court's decision below 'turned on the resolution of conflicts in the evidence or on factual inferences to be drawn from the evidence, we consider the evidence in the light most favorable to the trial court's ruling and review the trial court's factual determinations under the substantial evidence standard. [Citation.]' [Citation.] Where there is a fiduciary duty, breach of the duty is a question of fact." (*Ibid.*) We review the court's finding with regard to breach for substantial evidence, resolving all conflicts and drawing all reasonable inferences in favor of the decision. (See *ibid.*)

Applying this substantial evidence standard compels us to hold mother has forfeited her contentions that father misappropriated community funds or breached his fiduciary duty. The court did not rule father owed no fiduciary duty to mother, it found "overwhelming" evidence he did not *breach* his duty to her. It is incumbent on mother as the appellant "to state fully, with transcript references, the evidence which is claimed to be insufficient to support the findings." (*In re Marriage of Fink* (1979) 25 Cal.3d 877, 887-888.) Mother fails to provide a fair summary of the facts underlying the

contentions with references to the record.[12]  When challenging the court's finding she must "set forth, discuss, and analyze all the evidence on that point, both favorable and unfavorable.  [Citation.]  . . .  [¶]  . . .  Because [mother] has failed in [her] obligations concerning the discussion and analysis of a substantial evidence issue, we deem the issue waived." (*Doe v. Roman Catholic Archbishop of Cashel & Emly* (2009) 177 Cal.App.4th 209, 218.)

Even if mother had not forfeited the issue, substantial evidence supports the court's findings.  This includes father's own testimony that he in fact notified mother about his and Dr. Bullock's partnership, Kahrs's testimony about intellectual property legal treatment of expense allocation, and father's forensic expert's testimony concerning cost deductions from gross receipts.  The family court was entitled to credit their testimony to conclude father did not misappropriate community property funds and did not breach his fiduciary duty.  We have no power to revisit the credibility of witnesses or

---

[12]    Mother references testimony from an art dealer/appraiser who had once shown father's art and received a 50 percent commission from the sales.  The dealer testified that she marketed father's exhibition, created an invitation, and paid for a television commercial, lodging and airfare, transportation and food, but did not cover insurance or storage.  The other witness was mother's expert appraiser, who testified that the standard for commissions between gallery and artist was a 50/50 split, and the gallerist would deduct from his or her share "all of the costs of exhibiting, promoting, making available the artist, et cetera.  All the promotion marketing, exhibition, expenses, *as spelled out in the contract between the artist and his representative at the gallery*.  All of those expenses come out of the gallerist's 50 percent." (Italics added.)  The testimony does not squarely conflict with father's expert's position, but we disregard contrary evidence in any event when reviewing for substantial evidence.  " 'The fact that there was substantial evidence in the record to support a contrary finding does not compel the conclusion that there was no substantial evidence to support the judgment.' " (*Verrazono v. Gehl Co.* (2020) 50 Cal.App.5th 636, 652.)

reweigh the evidence. (*In re Marriage of Dandona & Araluce* (2001) 91 Cal.App.4th 1120, 1126 [appellate court will not reweigh evidence or revisit credibility determinations made at trial].)

B. *Father's Overpayment to Mother of Business Overhead Expenses*

As indicated above, referring to forensic accountant Kahrs's report, the family court found certain expenses that father had deducted from his gross income were "reasonable and necessary . . . to maintain the overhead of father's business." Applying Kahrs's schedules, it determined that father had overpaid mother $22,445 in overhead expenses, and based on father's prior underpayment of community property royalties and art sale proceeds, ordered that mother reimburse father $14,281 "pursuant to the orders referenced above."

Mother contends the family court abused its discretion in determining the $22,445 overpayment. She argues it misunderstood or misapplied the "standard business practices concerning the handling of commissions and overhead expenses" that both parties' experts assertedly testified about during trial. Without record citation, mother asserts that father's "business partner deviated from this norm by not deducting overhead costs from . . . commissions," resulting in father's claim of an overpayment. Mother asserts the court's "failure to consider this uniform expert testimony suggests a disregard for standard business practices, which is crucial in determining the correct financial obligations between the parties." According to mother, "[t]he trial court's acceptance of this deviation without sufficient scrutiny of the established practices led to an unfair and potentially incorrect financial burden on [her]."

Apart from providing record citations for the expert testimony that she relies upon, mother does not support these claims—including her argument

about the applicable standard of review—with reasoned legal argument or case authority. She does not support the assertion that the expert opinion about standard practices in the art industry was "crucial" in figuring the parties' financial obligations. The overpayment itself is supported by substantial evidence, namely expert Kahrs's testimony. Mother's bare arguments do not establish error or prejudice.

C. *Order that Father Have Exclusive Possession and Control of Community Property Artwork*

Mother contends the family court abused its discretion in granting father exclusive possession, management and control of the community property artwork. She acknowledges that the court drew this inference from the parties' June 10, 2016 stipulation and order, but she "refutes this interpretation" as to the physical artwork based on the community property nature of the underlying intangible copyright. According to mother, their stipulation "infers that" federal copyright law effectively preempts California community property law, but case law—*In re Marriage of Worth* (1987) 195 Cal.App.3d 768—rejects that notion. She asserts that she and father "remain as co-owners of an undivided interest in the community property art and the associated copyrights" and the conclusion that their stipulation negates that claim is "unfounded." Mother asks this court to modify the judgment to give her "equal possession of all community property and to reinterpret the stipulation as to its true meaning."

In a dissolution proceeding, a family court must divide the parties' community estate equally "[e]xcept upon [the parties'] written agreement . . . ." (§ 2550; *In re Marriage of Dellaria & Blickman-Dellaria* (2009) 172 Cal.App.4th 196, 201.) Thus, parties can agree on a lopsided division of community property, and "the court *must* accept the parties' written

33

agreement . . . regarding the disposition of their property.  [Citation.]  The court's 'only role with regard to a proper stipulated disposition of marital property is to accept the stipulation and, if requested, to incorporate the disposition into the judgment.' "  (*Ibid*.)  Here, the court did so, and mother's challenge is to the stipulation's interpretation.

Courts interpret stipulations, including stipulations entered as a court order, in accordance with the ordinary rules of contract interpretation. (*Semprini v. Wedbush Securities Inc*. (2024) 101 Cal.App.5th 518, 528; *Dowling v. Farmers Ins. Exchange* (2012) 208 Cal.App.4th 685, 694.)  We would thus independently review the parties' June 10, 2016 stipulation so as to ascertain the parties' mutual intention.  (*Semprini*, at p. 528; *Dowling*, at p. 694; see Civ. Code, § 1636 [a writing "must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful"].)  We also would look to "the circumstances under which [the stipulation] was made, and the matter to which it relates."  (Civ. Code, § 1647.)

The parties' June 10, 2016 stipulation and order was very detailed about father's intellectual property interests in his artwork, including making him the sole owner of the copyright to all of his works.  It broadly specified that father "shall retain all other intellectual property rights to the Community Artwork, including but not limited to:  [¶] a.  the exclusive rights of an author set forth in 17 U.S. Code 106:  [¶]  (1) to reproduce the copyrighted work in copies or phonorecords; [¶]  (2) to prepare derivative works based upon the copyrighted work; [¶] [and] (3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease or leasing (subject to [mother's] right to

34

payment of income as set forth above for the sale of print reproductions and royalties) . . . ."  The stipulation gave father the right under federal copyright law for his various types of works to, among other things, "perform" or "display" the work publicly; to claim authorship; to prevent the use of his name on works he did not create; and to transfer copyright ownership "including but not limited to the right to assign, grant an exclusive or non-exclusive license, subject to [mother's] right to payment of income as set forth above for the sale of print reproductions and royalties[ ]."  It gave father "the exclusive rights to negotiate and agree upon the terms and rates of royalty payments and the proportionate division of fees paid among various copyright owners, the designation of common agents to negotiate, agree to, pay, or receive payments, an enter into licensing agreements set forth in 17 U.S. Code 118 with respect to works of visual art and literary works identified in Exhibit A, provided that [father] shall not take any action to diminish royalty payments to [mother] provided for above . . . ."

From these provisions, the trial court inferred that father would retain exclusive possession and control of the community property artworks, and that mother's community property right in the works was limited to the specified income stream.  We have independently reviewed the plain language of the stipulation, its circumscription of mother's community property rights, and its award of the copyright and "all other intellectual property rights" to father, giving father authority to handle those rights in specified ways.  The parties were free to reach an agreement concerning the division of the community artwork, and in view of the express limitation of mother's community interest, and the broad grant of rights to father in handling his intellectual property rights, we reach the same conclusion, and hold the trial court did not err in clarifying that father would retain exclusive

35

possession and control over those works so as to exercise and protect those rights.

Mother's citation to *In re Marriage of Worth*, *supra*, 195 Cal.App.3d 768, is unavailing. *Worth* involved a former spouse's claim of entitlement to proceeds from a copyright infringement lawsuit based on books written and published by the other spouse during the marriage. (*Id.* at pp. 771-773.) The couple in their divorce decree had agreed to divide equally the royalties from those books. (*Id.* at p. 771.) The court there held that not only the copyright royalties and profits, but also ownership of the copyrights themselves, belonged to the marital community. (*Id.* at pp. 773-774; but see *Berry v. Berry* (2012) 127 Hawai'i 243, 261-262 [rejecting *Worth*'s approach and holding any community property interest in copyright ownership is preempted by the federal Copyright Act's protection of authorship].)

There is no indication in the June 2016 stipulation or the record more broadly that the parties intended to incorporate or follow California law in their treatment of the community artwork. The critical issue, as mother's acknowledges, is how the parties agreed to treat that artwork. We are concerned only with the interpretation of their June 2016 stipulation, which supports a conclusion that father was to retain exclusive possession, management and control of the community artwork pending its sale. Given that the judgment results from the parties' agreement, which does not incorporate California law on the issue, *Worth*'s analysis does not govern.

IV. *Order for Reimbursement of Family Law Evaluation Fees/Services Expenses and Special Master Fees Advanced by Father*

In its judgment, the family court found father had paid an accounting firm to conduct an analysis of his business valuation and income available for support, without any contribution from mother. It found the accounting firm

36

had an outstanding judgment against the parties for unpaid work. The court further found father had paid an evaluator $7,700 in fees for a parental competency evaluation conducted at mother's request, which ultimately "dispelled [mother's] unreasonable allegations and positions regarding [his] competency as a parent." The court found father had paid a special master $5,000 "subject to reallocation." Based on these findings, the court ordered mother to (1) pay 45 percent of any outstanding judgment obtained by the accounting firm; (2) reimburse father $7,700 for the evaluator's fees; and (3) reimburse father $2,500, one half of the special master fees. It ordered the reimbursements be paid "forthwith."

Pointing out that the family court originally ordered father to cover these costs, Mother contends the court abused its discretion by ordering that she make these payments in the face of her "significant and documented deterioration in her financial condition," the worsening financial disparity between her and father, and her "limited financial ability." She maintains the court's order "contravene[s] principles of fairness and equity" and "d[oes] not reflect a balanced consideration of the parties' current capacities to pay, ignoring the foundational reasons for the initial allocation." Mother cites *Peterson v. Thompson* (2023) 89 Cal.App.5th 988, for the proposition that courts cannot allocate any portion of a custody evaluator's fees to a litigant who objects that she cannot afford to pay them until it "thoroughly assess[es] that litigant's ability to pay, taking into account not only income and assets but also indebtedness, ongoing basic expenses and other obligations, including those previously imposed by the court itself earlier in the litigation." (*Id.* at p. 1005.)

Characterizing mother's arguments as directed to the immediacy of the reimbursement payments (ordering mother to pay "forthwith"), father argues

37

mother forfeited or waived the issue, and also failed to provide an adequate record by omitting from the record the prior orders in the parties' proceedings. Acknowledging *Peterson v. Thompson, supra*, 89 Cal.App.5th 988, he further argues the court did consider mother's ability to pay by identifying a source for payment, that is, the trust account containing $243,000.

Father's latter contention has merit. In its judgment, the family court made detailed findings concerning mother's income and expenses, as well as her lesser earning ability. It observed "a great disparity in the parties' resources" and acknowledged that "father has significantly more income and earning ability than mother and he retains his separate property art." It acknowledged mother "was not working to her potential" and had "lost her community property stream of income in the book royalties to the bankruptcy estate."

Nevertheless, the court found mother had a source of income to reimburse father, ordering mother's outstanding payment obligations to father come from the account in which father held mother's share of community art sale proceeds, conditioned on bankruptcy court approval. In fact, the family court specifically explained to counsel after orally reciting its rulings that that account was "where I would expect that these forthwith payments would get paid from, *because I understand* [*mother*] *doesn't have any other source.* So yes, to the extent I have the authority to make the orders payable from the bankruptcy estate, that's where I . . . make that order." (Italics added.) The judgment states that the court's order "was intended to identify a source of payment for the outstanding obligations due from mother . . . to father . . . and that this source would have to be exhausted

first, with bankruptcy court approval, before father . . . could seek other sources of payment or methods of enforcement in family court."

## V. *Section 271 Sanctions*

A. *The Sanctions Order*

The family court ordered mother to pay father $75,000 in sanctions under section 271. In doing so, it found:

• Mother had "[t]hroughout these proceedings" asserted father was in arrears in his support payments, claiming he owed her $60,328 in child support arrearages for July 2011 through February 2012. Father's attorneys "[f]or years" unsuccessfully made attempts to resolve the issue, leading mother in March 2018 to file papers for a writ of execution and notice of levy. The writ of execution issued and father moved to quash the writ, but this issue was not resolved until April 2023, when the parties stipulated to quash the writ. At trial, the parties' forensic experts agreed father had paid mother $148,861 for that period, representing only a $5,467 underpayment, a fraction of what mother claimed.

• In her Chapter 7 bankruptcy proceeding mother claimed father had incurred $122,797 in child and spousal support arrearages without explaining in discovery how she arrived at that amount. Father's family law counsel and bankruptcy counsel both attempted to resolve the issue without success, and at the time of the judgment it was "unknown how mother arrived at this amount."

• Father overpaid support to mother by over $90,000 from May 2020 through July 2021, but mother notified him only once about those inadvertent support overpayments. She then did not return the money, but used it to fund some of her attorneys' fees without amending her bankruptcy pleadings to update the bankruptcy court on the issue.

39

• The bankruptcy court found mother engaged in bad faith in moving to convert her bankruptcy to Chapter 13, by "claim[ing] she had the ability to fund a 100 [percent] Chapter 13 plan, while contradictorily claiming she lacked financial resources in the family court on three separate occasions." The bankruptcy court also found that mother had "declined to pursue the family court case for 'tactical reasons,' to 'affect state court litigation[,']' another sign of bad faith."

• "Mother's conduct in filing the Chapter 7 bankruptcy, making inconsistent statements to the two courts, attempting conversion from a Chapter 7 to a Chapter 13 action, threatening to pursue her motion to set aside the parties' stipulation and order on financial issues and her tactical delay of the bankruptcy court case to affect the family law case is sanctionable."

• Mother failed to comply with custody/visitation orders; insisted on an unnecessary parenting competency evaluation, which delayed the family court case and the implementation of father's custodial time; took unreasonable positions on custody matters; and failed to inform, discuss and agree upon major child sharing decisions with father concerning the health, education and welfare of their children. She "created or allowed a hostile attitude and environment in her home against father, to the point that the two adult daughters hate their father and want nothing to do with him" and their "youngest child is at great risk of following the path of his older sisters."

• As of the end of March 2023, father had incurred and paid $810,922 in fees for both the family law and bankruptcy cases ($532,196 and $278,726, respectively). Mother claimed she incurred $334,000 in the family law action. Mother "over-litigated" the family law case, which father had to defend, albeit

without an adequate explanation as to why he had incurred so much more in attorney fees.

After acknowledging the "great disparity" in the parties' resources, the court ordered that mother pay father $25,000 for her actions in claiming support arrearages and attempting to enforce it by writ of execution; $25,000 for her conduct in the bankruptcy case, and $25,000 for her unreasonable positions and disregard of court orders in the custody and visitation matters. The court then ordered father to pay mother $75,000 in attorney fees and costs under section 2030, and offset that amount by the $75,000 in sanctions that mother owed to him.

After netting the section 271 and discovery sanctions with father's obligation to pay attorney fees, the court ordered mother to pay $5,000 in section 271 sanctions and $5,000 in discovery sanctions.[13]

B. *Legal Principles*

Under section 271, "the court may base an award of attorney's fees and costs on the extent to which the conduct of each party or attorney furthers or frustrates the policy of the law to promote settlement of litigation and, where possible, to reduce the cost of litigation by encouraging cooperation between the parties and attorneys." (§ 271, subd. (a).) Such an award of fees and costs "is in the nature of a sanction." (*Ibid.*; accord, *Featherstone v. Martinez* (2022) 86 Cal.App.5th 775, 783 [" 'section 271 vests family law courts with an additional means with which to enforce this state's public policy of promoting settlement of family law litigation, while reducing its costs through mutual cooperation of clients and their counsel' "].)

---

[13] Mother does not challenge on appeal the discovery sanctions order under Code of Civil Procedure sections 2023 and 2031.

To be sanctionable under section 271, a party's conduct need not be frivolous or taken solely for the purpose of delay. (*Parker v. Harbert* (2012) 212 Cal.App.4th 1172 1177.) "[S]ection 271 sanctions have been upheld for 'obstreperous conduct which frustrated the policy of the law in favor of settlement, and caused the costs of the litigation to greatly increase' [citation], and for making a one-sided, overreaching demand." (*In re Marriage of Freeman* (2005) 131 Cal.App.4th 1, 6.) "The duty imposed by . . . section 271 requires a party . . . to be cooperative and work toward settlement of the litigation on pain of being required to share the party's adversary's litigation costs." (*Boblitt v. Boblitt* (2010) 190 Cal.App.4th 603, 612.)

"We review a family court's decision to grant or deny attorney fees under section 271 . . .  under an abuse of discretion standard. [Citation.] 'While sanctions are discretionary, the term judicial discretion implies absence of arbitrary determination, capricious disposition, or whimsical thinking. It imports the exercise of discriminating judgment within the bounds of reason. To exercise the power of judicial discretion, all the material facts must be known and considered together also with the legal principles essential to an informed, intelligent and just decision. [Citation.] Therefore, the court must examine the entire record in determining whether the ultimate sanction should be imposed.' " (*In re Marriage of Tharp* (2010) 188 Cal.App.4th 1295, 1316.) A court will overturn an award of section 271 sanctions " ' "only if, considering all of the evidence viewed most favorably in its support and indulging all reasonable inferences in its favor, no judge could reasonably make the order." ' " (*Parker v. Harbert*, *supra*, 212 Cal.App.4th at p. 1177.)

Questions regarding a court's statutory authority to make an award of sanctions are reviewed de novo, and any findings of fact that form the basis

for an award are reviewed for substantial evidence. (*George v. Shams-Shirazi* (2020) 45 Cal.App.5th 134, 138; *In re Marriage of Falcone & Fyke*, *supra*, 203 Cal.App.4th at p. 995.) " 'Where [a] statement of decision sets forth the factual and legal basis for the decision, any conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision.' " (*In re Marriage of Davenport*, *supra*, 194 Cal.App.4th at p. 1531.)

C. *Mother's Contentions*

Mother contends the court abused its discretion by awarding father $75,000 in sanctions, then offsetting that amount against his responsibility for mother's attorney fees. She maintains the court was "sanctioning [her] for taking litigation positions that [it] disagreed with, but not for taking actions that frustrated settlement positions." According to mother, the court's findings concerning her unreasonable positions and failure to follow orders do not merit the sanctions, and are improper grounds for them as she "had no cause to delay bankruptcy proceedings" and the family court hearing schedule was "beyond [her] control." She argues her actions were aimed at protecting her and her child's rights, not at obstructing the settlement of the case, and suggests she lacked the financial ability to over-litigate the case, which she asserts is itself not grounds for sanctions. Pointing to the court's finding that father was not as engaged with their children as he could have been, she characterizes the circumstances as "mutual fault" and "far less compelling" than those in *Featherstone v. Martinez, supra,* 86 Cal.App.5th 775, in which the Court of Appeal reversed a family court's section 271 sanctions order. Mother further argues the court did not properly consider her financial condition, her hourly, part-time income and high monthly expenses.

43

D. *Analysis*

As mother seems to acknowledge, our review of the court's sanctions award is highly dependent on the facts of mother's conduct during family court and bankruptcy proceedings and its impact on litigation costs and settlement efforts. However, in stating underlying facts and purporting to apply appellate review standards, mother repeatedly cites to pages of the reporter's transcripts that do not exist in the record. To the extent mother attempts to rebut the family court's findings as to her conduct, she merely recites circumstances in the light most favorable to her, contrary to settled appellate review standards. In our review for abuse of discretion, we do not assess the facts anew or judge credibility. Mother's briefing makes it impossible to determine whether substantial evidence supports the family court's sanctions order, so we do not disturb the court's underlying factual findings.

Accepting those findings, we are not persuaded by mother's reliance on *Featherstone v. Martinez, supra*, 86 Cal.App.5th 775. The family court there sanctioned a mother in a child custody dispute $10,000 because she had a "controlling 'mindset,' " sought to disqualify the judge for bias, and filed a proposed judgment with errors. (*Id*. at pp. 784-786.) The appellate court held the sanctions based on mother's conduct in submitting a declaration suggesting she was controlling or acting as "the boss," and asking for video calls with their child be conducted on a particular platform, were "principally sanctioning mother not for taking actions that frustrated settlement efforts but for taking litigation positions with which the court disagreed." (*Id*. at p. 785.) It held the mother's disqualification request was not sanctionable, particularly where the record suggested the family court was "miffed about being accused of bias." (*Id*. at p. 785, fn. 8.) Finally, the *Featherstone* court

44

held the mother's filing of an error-filled proposed judgment did not justify the sanctions award, which was "infected with [the family court's] other inappropriate considerations . . . ." (*Id*. at pp. 785-786.) The court reversed the award.

The family court's findings here are not like those in *Featherstone supra*, 86 Cal.App.5th 775. The written ruling shows that the sanctions order against mother was based on mother's unsupported claims of arrearages that father unsuccessfully tried to resolve, bad faith behavior in litigating her bankruptcy or tactically not litigating certain issues so as to affect her bankruptcy proceedings, failure to quickly resolve obvious overpayments in support, her creation of a hostile attitude toward father with regard to their children, her failure to comply with court orders, and her overlitigation of the family court proceedings. Mother is incorrect that failure to comply with court orders is not sanctionable conduct. (See *Menezes v. McDaniel* (2019) 44 Cal.App.5th 340, 349 [section 271 sanctions proper where wife failed to comply with court order directing her to aid in transfer of title to real property to husband's name].) The recited conduct needlessly lengthened court proceedings and increased litigation costs for all of the parties, and frustrated the policy of settlement.[14]

We turn to mother's claim that the court did not properly consider her financial condition. It is true that under section 271, the trial court is to consider "all evidence concerning the parties' incomes, assets, and liabilities," and the court "shall not impose a sanction . . . that imposes an unreasonable

_____

14     We note that father maintains mother never objected or made any argument to the family court that her conduct was not sanctionable. He asserts she "conceded that her behavior was sanctionable." But his record citation for that point does not support the assertion. Rather, at the cited portion of the record, mother asked the family court to award sanctions against father for his asserted breach of fiduciary duty.

45

financial burden" on the sanctioned party. (§ 271, subd. (a); see § 270.) Without citation to the record, mother points to the fact she was supporting their minor child but working 25 hours per week at $19.40 per hour, only nine months of the year, with $8,000 in what the court found were reasonable monthly expenses based on her March 2023 income and expense declaration. But there is no indication in the record that the court failed to consider the evidence that was before it pertaining to that question. (E.g., *In re Marriage of Rangell* (2023) 95 Cal.App.5th 1206, 1224 [no suggestion in the record that the trial court disregarded evidence pertaining to husband's ability to pay section 271 sanctions award].) Mother cites no authority that an express finding by the trial court on that question is a prerequisite to the validity of a section 271 sanctions award. And on this claim as well, mother selectively recites the facts favorable to her; she fails to address the court's imputation of $5,000 in monthly income to her or the fact she has access to over $240,000 held on her behalf subject to bankruptcy court approval. Mother cites no authority suggesting it was improper for the family court to offset father's section 2030 attorney fee obligation by the sanctions award. She does not establish error or prejudice in the court's sanctions order.

DISPOSITION

The judgment is affirmed.  Respondent K.A.N. shall recover his costs on appeal.


O'ROURKE, Acting P. J.

WE CONCUR:


DATO, J.


CASTILLO, J.